Laurence ("Laird") J. Lucas (CA Bar No. 124854)
llucas@advocateswest.org
Elizabeth H. Potter (*pro hac vice* application to be filed)
epotter@advocateswest.org
Andrew R. Missel (*pro hac vice* application to be filed)
amissel@advocateswest.org
ADVOCATES FOR THE WEST
PO Box 1612
Boise ID 83701
Telephone: (208) 342-7024

Michael R. Lozeau (CA Bar No. 142893)
michael@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison St., Suite 150
Oakland CA 94612
Telephone: (510) 836-4200

Attorneys for Plaintiffs
RESOURCE RENEWAL INSTITUTE,
CENTER FOR BIOLOGICAL DIVERSITY,
and WESTERN WATERSHEDS PROJECT

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE; CENTER FOR BIOLOGICAL DIVERSITY; and WESTERN WATERSHEDS PROJECT,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL PARK SERVICE, a federal agency,<br><br>Defendant. | Case No. 3:22-cv-145<br><br>**COMPLAINT**<br><br>(Administrative Procedure Act Case) |

**INTRODUCTION**

1.      Plaintiffs Resource Renewal Institute, Center for Biological Diversity, and Western Watersheds Project challenge Defendant National Park Service's (NPS or the "Park Service") decision to expand beef and dairy ranching on public lands within Point Reyes National Seashore and Golden Gate National Recreation Area (GGNRA). In so doing, NPS prioritized the commercial needs of ranchers instead of providing maximum protection to the natural environment and supporting the public's use and enjoyment of these majestic lands along the California coast.

2.      In the 1970s and 1980s, Congress spent well over $100 million (in 2021 dollars) buying private ranches to establish Point Reyes National Seashore for "purposes of public recreation, benefit, and inspiration," 16 U.S.C.§ 459c (the "Point Reyes Act"), and to establish GGNRA "for public use and enjoyment…." 16 U.S.C. § 460bb (the "GGNRA Act"). These Acts did not make ranching a purpose of these public lands and did not encourage NPS to allow ranching there. Instead, the Point Reyes Act required NPS to ensure the "maximum protection, restoration and preservation of the natural environment" of the Seashore, thereby prioritizing this duty above all other uses of these public lands, including ranching. 16 U.S.C. § 459c-6(a).

3.      Nevertheless, for decades, NPS has devoted roughly 28,000 acres of these public lands—including almost one third of the lands managed by Point Reyes National Seashore—to commercial beef and dairy ranching despite the significant harm that it causes to environmental, scenic, and recreational values. NPS has long been aware that ranching contributes to violations of state water quality standards, consumes large amounts of surface water and groundwater, promotes invasive and nonnative vegetation, and causes conflicts with wildlife and public recreation. But NPS neglected its duty to carefully consider these effects until Plaintiffs sued in 2016 and forced the agency to decide the future of ranching through an Environmental Impact Statement (EIS) and an amendment to its 1980 General Management Plan (GMP).

4.      During the subsequent public process, more than 100 groups representing millions of members and supporters, along with other individuals, demanded NPS adhere to its statutory mandates to protect these lands by phasing out ranching at the National Seashore and GGNRA.

Plaintiffs, other members of the public, scientists, and other agencies raised a wide range of concerns about the impacts of ranching on the environment and public enjoyment. NPS largely ignored these comments, along with overwhelming public opposition, and prioritized ranchers' commercial interests over public needs. In September 2021, NPS issued a Record of Decision (ROD) adopting a GMP amendment (GMPA) that expanded the lands open to ranching; quadrupled the potential length of leases to 20 years; allowed ranchers to expand their operations with new commercial activities; required killing native tule elk to protect ranchers' profits; and allowed ranching to continue in perpetuity through an unreasonably permissive succession plan.

5.     NPS justified its decision by wrongly claiming that it must allow modern, commercial ranching to protect natural and cultural resources and by misinterpreting its legal duties. In so doing, NPS improperly rejected a "no ranching" alternative that would provide maximum protection for the natural environment—as required under the Point Reyes Act—along with no-dairying and reduced-ranching alternatives that would provide greater protection than the selected GMPA. NPS also ignored substantial evidence that expanding ranching is inconsistent with the agency's duties under the 1916 Organic Act to conserve and leave unimpaired dwindling water resources, native coastal prairie, tule elk, and other important resources for future generations.

6.     In making this decision, NPS also failed to take a hard look at the impacts of expanded ranching on these and other resources as required by the National Environmental Policy Act (NEPA). The EIS purported to include a site-specific analysis for certain ranching activities so that NPS can issue 20-year leases and allow ranchers to expand their commercial operations without further study or public scrutiny. But the EIS failed to disclose baseline information about individual ranches and resource conditions, making it impossible for the public to discern the likely impacts of each lease. Without such key information, NPS also failed to ensure that ranching would cease contributing to violations of state water quality standards.

7.     For these and other reasons, NPS's ROD, GMPA, and EIS are inconsistent with the agency's duties under the Point Reyes Act, the National Park Service's Organic Act, NEPA,

and the Clean Water Act (CWA). Thus, the Court should find that these decisions are arbitrary, capricious, and contrary to law, and set them aside as unlawful.

## JURISDICTION

8.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Park Service's Organic Act, 54 U.S.C. § 100101 *et seq.*; the Point Reyes Act, 16 U.S.C. § 459c *et seq.*; NEPA, 42 U.S.C. § 4321 *et seq.*; the Clean Water Act, 33 U.S.C. § 1251 *et seq.*; the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*

9.     The federal government waived sovereign immunity pursuant to 5 U.S.C. § 702.

10.    An actual, justiciable controversy now exists between Plaintiffs and Defendant. The requested relief is therefore proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

## DIVISIONAL ASSIGNMENT

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B) because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. Under Civil Local Rule 3-2(c) and (d), this civil action should be assigned to the San Francisco Division or the Oakland Division of this Court, because a substantial part of the events or omissions which give rise to the claims herein occurred in Marin County.

## PARTIES

12.    Plaintiff RESOURCE RENEWAL INSTITUTE (RRI) is a nonprofit corporation based in Fairfax, California, in the County of Marin. RRI was founded in 1985 by the late Huey D. Johnson, a former California Secretary of Resources who helped NPS acquire lands for Point Reyes as the co-founder and Executive Director of the Trust for Public Land. RRI fosters innovative and practical natural solutions to increasingly complex environmental problems, and unites diverse stakeholders to test and share these ideas for the benefit of all.

13.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit organization with offices and more than 189,000 members and supporters in California— including over 3,700 members in Marin County—and more than 1.7 million members and

1   supporters throughout the world. The Center works to ensure the preservation, protection, and

2   restoration of biodiversity, native species, ecosystems, public lands and waters, and public health

3   through science, policy, and law.

4        14.   Plaintiff WESTERN WATERSHEDS PROJECT (WWP) is a nonprofit

5   organization dedicated to protecting and restoring watersheds and wildlife in the American West

6   through education, public policy initiatives, and legal advocacy. WWP has over 12,000 members

7   and supporters, including many in the San Francisco Bay Area. WWP, as an organization and on

8   behalf of its members, is concerned with and seeks to protect and improve the public lands,

9   wildlife, other natural resources, and ecological values of western watersheds.

10       15.   Plaintiffs and their members, staff, and supporters have spent years working to

11  protect natural resources, wildlife, and public uses from ranching at the Seashore and GGNRA.

12       16.   Plaintiffs have members, staff, and supporters who live or work near, and who use

13  and enjoy the public lands and waters of, Point Reyes National Seashore and GGNRA for

14  recreational, conservation, educational, and/or other purposes such as hiking, wildlife viewing,

15  photography, scientific study, swimming, and spiritual renewal. They will continue to visit the

16  Seashore and GGNRA in the future for such purposes and to use and enjoy the natural and scenic

17  beauty of the area. Plaintiffs, as organizations and on behalf of their staff, members, and/or

18  supporters, have an interest in protecting and preserving the resources and public uses of these

19  public lands, and are directly harmed by Defendant's decisions challenged herein.

20       17.   Defendant's violations of law have injured and will continue to injure the

21  aesthetic, conservation, scientific, recreational, educational, procedural, and/or other interests of

22  Plaintiffs and their staff, members, and/or supporters. Defendant's decision to continue and

23  expand commercial livestock ranching harms Plaintiffs' and their members' use and enjoyment

24  of Point Reyes and GGNRA. Ranching prevents them and other members of the public from

25  accessing and enjoying parts of these public lands, and impacts adversely their activities where

26  they do occur. These are actual, concrete injuries caused by Defendant's violations of law, and

27  the judicial relief sought would remedy, in whole or in part, these injuries. Plaintiffs have no

28  adequate remedy at law, and thus the requested relief is appropriate.

COMPLAINT – Page 5

18.     Plaintiffs exhausted their administrative remedies by submitting comments, letters, and other information to NPS during the GMPA planning processes.

19.     Defendant NATIONAL PARK SERVICE is an agency or instrumentality of the United States, within the U.S. Department of the Interior. NPS is vested with the authority and duty to manage and protect Point Reyes National Seashore and GGNRA.

## LEGAL BACKGROUND

**National Park Service Organic Act**

20.     Congress created NPS through the Organic Act in 1916 and has since required the agency to promote and regulate the use of the National Park System:

> by means and measures that conform to the *fundamental purpose* of the System units, which purpose is *to conserve the scenery, natural and historic objects, and wild life in the System units* and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and *by such means as will leave them unimpaired for the enjoyment of future generations*.

54 U.S.C. § 100101(a) (previous version at 16 U.S.C. § 1) (emphasis added). The italicized language is often referred to as the Organic Act's "nonimpairment mandate."

21.     NPS defines "impairment" as any authorized activity that "would harm the integrity of park resources or values, including the opportunities that otherwise would be present for the enjoyment of those resources or values." 2006 NPS Management Policies § 1.4.5.

22.     Where NPS has discretionary authority to authorize a use, such as ranching, that discretion may only be exercised if "the use will not cause impairment or unacceptable impacts." 2006 NPS Management Policies § 1.4.3.1.

23.     The Organic Act also requires NPS to prepare and timely revise general management plans (GMPs) for the preservation and use of all national parks and other lands within its jurisdiction. 54 U.S.C. § 100502. GMPs must address, "measures for the preservation of the area's resources" along with "types and general intensities of development … associated with public enjoyment and use of the area," among other elements. *Id*.

**Point Reyes National Seashore Act**

24.     In 1962, Congress enacted the Point Reyes Act to establish the Point Reyes National Seashore as part of the National Park System in order "to save and preserve, for

purposes of public recreation, benefit, and inspiration, a portion of the diminishing seashore of the United States that remains undeveloped…." 16 U.S.C. § 459c.

25.     The Point Reyes Act authorized the Secretary of the Interior (Secretary) to acquire the lands, waters, and other property within the bounds of Point Reyes peninsula. 16 U.S.C. § 459c-2, 459c-4. The original enabling act prohibited the taking of agricultural lands by eminent domain, so long as they remained agricultural. Pub. L. No. 87-657, § 4, 76 Stat. 538, 540 (1962). But in 1970, completion of the National Seashore was in jeopardy, so Congress amended the Point Reyes Act to repeal the provision prohibiting the condemnation of agricultural lands. Pub. L. No. 91-223, §2(b), 84 Stat. 90 (1970) (now codified at 16 U.S.C. § 459c-7).

26.     At that time, NPS was required to manage the Seashore in accordance with laws of general applicability for the National Park System, including the Organic Act. 16 U.S.C. § 459c-6(a) (1970).

27.     In 1976, Congress amended the enabling statute to provide additional and more specific direction for the management of the Seashore. As amended, the Point Reyes Act requires that the Seashore shall be administered "*without impairment of its natural values*, in a manner which provides for such recreational, educational, historical preservation, interpretation, and scientific research opportunities as are consistent with, based upon, and supportive of the *maximum protection, restoration, and preservation of the natural environment within the area*…." Pub. L. No. 94-567, § 7(a), 90 Stat. 2692, 2695 (1976) (emphasis added) (codified at 16 U.S.C. § 459c-6(a)). The Park Service unsuccessfully opposed this amendment, claiming it would be inconsistent with existing ranching operations at the Seashore.

28.     In 1978, Congress again amended the Point Reyes Act to allow owners of agricultural property not yet acquired by NPS to elect, at the time of acquisition, a right of use and occupancy (RUO) for 25 years, or for the life of the owner or their spouse. Pub. L. No. 95-625, § 318(b), 92 Stat. 3467, 3487 (1978) (codified at 16 U.S.C. § 459c-5(a)). Congress also provided the Secretary with the option to lease out formerly agricultural land, provided that such leases "shall be subject to such restrictive covenants as may be necessary to carry out the purposes of" the Point Reyes Act. *Id.* When passing this amendment, Congress did not alter the

Act's public purposes, did not make ranching a purpose of the Act, and did not repeal the Act's mandates that NPS ensure the non-impairment and maximum protection of natural resources.

**The GGNRA Act**

29.     Congress established GGNRA in 1972 "[i]n order to preserve for public use and enjoyment certain areas of Marin and San Francisco Counties, California, possessing outstanding natural, historic, scenic, and recreational values, and in order to provide for the maintenance of needed recreational open space necessary to urban environment and planning…." Pub. L. No. 92-589, § 1, 86 Stat. 1299, 1299 (codified at 16 U.S.C. § 460bb).

30.     The GGNRA Act provides that the Secretary "shall utilize the resources in a manner which will provide for recreation and educational opportunities consistent with sound principles of land use planning and management … and shall preserve the recreation area, as far as possible, in its natural setting, and protect it from development and uses which would destroy the scenic beauty and natural character of the area." 16 U.S.C.§ 460bb.

31.     In 1978, the GGNRA Act was amended with the Point Reyes Act to similarly authorize NPS's acquisition and leasing of agricultural property. Pub. L. No. 95-625, § 317(c), 92 Stat. 3467, 3485 (1978) (codified at 16 U.S.C. § 460bb-2(j)).

## FACTUAL BACKGROUND

**History of Point Reyes National Seashore and Northern District of GGNRA**

32.     Point Reyes National Seashore is located on a coastal peninsula in western Marin County, California, and encompasses more than 71,000 acres, 80 miles of undeveloped coastline, and the tide and submerged lands to a quarter mile offshore. It contains stunning and diverse natural landscapes such as breathtaking headlands, coastal cliffs, sandy and rocky beaches, rolling grasslands, coastal forests, meandering streams, and bays and inlets. Approximately 32,000 acres is wilderness, which encompasses forests, grasslands, beaches, and coastline, and includes over 100 miles of trails. Point Reyes is the only National Seashore on the West Coast and its natural resources are among the most diverse in the National Park System.

33.     Point Reyes National Seashore has a rich cultural heritage that began with the indigenous Coast Miwok, who inhabited the peninsula since time immemorial. In the 1800s,

settlers largely displaced these native people from their ancestral territory, and subsequently established cattle ranching throughout the area.

34.     After the Point Reyes Act established the National Seashore, NPS purchased more than a dozen privately-owned ranches within its boundaries during the 1970s for at least $14,000,000, which equates to more than $100,000,000 in 2021 dollars. NPS similarly purchased private ranches in the 1970s to create GGNRA. Given the overlap with ranch management issues between these two parks, the Park Service administers approximately 15,000 acres of the Northern District of GGNRA together with Point Reyes National Seashore.

35.     In 1980, NPS issued the first GMP for Point Reyes National Seashore and the Northern District of GGNRA. The 1980 GMP delineated a 19,854 acre "Pastoral Zone" within the Seashore where livestock ranching could continue "where feasible" and "within the limits of carefully monitored range capacities." Nevertheless, the 1980 GMP recognized that "natural resource management considerations will not support grazing in all areas where it has occurred historically" and that operations were restricted to "the use of the lands to traditional ranching only." It also determined that "the primary objectives for the park must continue to relate to the natural integrity of the seashore, upon which the quality of a Point Reyes experience totally depends."

36.     NPS has since authorized approximately 24 ranching operations on approximately 18 allotments across approximately 18,000 acres within the Seashore, which include six dairy operations that occupy approximately 6,300 acres, and on approximately 13 allotments across 10,000 acres within the northern GGNRA, which solely include beef ranches.

37.     NPS has also allowed some ranchers to expand their commercial operations to include thousands of chickens and horse boarding. And in some cases, when ranchers left the Seashore, their leased acres were transferred to other ranching operations, enlarging them, rather than returning those lands to nature. NPS has also allowed ranchers to pursue other operations for personal use, resulting in an unknown number of other livestock and pets on public lands.

38.     The following map depicts the 31 ranching allotments spread across 28,000 acres of these public lands where NPS has allowed private, commercial ranching to continue:

COMPLAINT – Page 9



| Allotment | Ranch | Permit Acres |
|---|---|---|
| 1 | A Ranch (Dairy) | 838 |
| 2 | B Ranch (Dairy) | 1,257 |
| 3 | C Ranch/D Ranch (Dairy) | 850 |
| 4 | D Ranch Pasture B & C | 581 |
| 5 | E Ranch | 1,372 |
| 6 | F Ranch | 1,510 |
| 7 | ATT | 481 |
| 8 | G Ranch | 1,151 |
| 9 | D. Rogers Ranch | 382 |
| 10 | M Ranch | 1,176 |
| 11 | H Ranch | 1,099 |
| 12 | I Ranch (Dairy) | 1,076 |
| 13 | L Ranch (Dairy) | 1,126 |
| 14 | K Ranch | 566 |
| 15 | J Ranch/K Ranch (Dairy) | 1,134 |
| 16 | N Ranch | 924 |
| 17 | Home Ranch Developed Complex | 20 |
| 18 | Home Ranch | 2,660 |
| 19 | Martinelli Ranch | 259 |
| 20 | Genazzi Ranch | 436 |
| 21 | E. Gallagher Ranch | 320 |
| 22 | McFadden Ranch | 335 |
| 23 | C. Rogers Ranch | 229 |
| 24 | Zanardi Ranch | 404 |
| 25 | McIsaac Ranch | 1,403 |
| 26 | Cheda Ranch | 808 |
| 27 | Percy Ranch/Percy ROP* | 687 |
| 28 | Stewart Ranch/Lupton/Truttman | 2,168 |
| 29 | Stewart Ranch Developed Complex | 19 |
| 30 | R. Giacomini Ranch | 1,858 |
| 31 | Commonwealth/Niman ROP* | 781 |

**Legend**

— Point Reyes Administered Land      **jk** Reserved Life Estate
▧ GMP Amendment Planning Area      ▨ Beef Cattle Operations *
▧ NPS Lands Outside Planning Area   ▨ Dairy Operations *
— County Boundary
— Major Road

Sources:
NPS 2016-2018, ESRI 2017

North
A

0        4 Kilometers
0      2.5 Miles

### Natural Resources and Public Uses of the National Seashore and GGNRA

39.     More than 2 million people visit the Seashore each year to enjoy its inspiring

scenery and natural resources, to view wildlife, and to engage in recreational or educational

activities. Tourism's economic contributions to the local economy dwarf those of ranching, with

tourism generating nearly $100 million more than ranching within gateway communities and

1  creating nearly 10 times more jobs than ranching.

2      40.    The Seashore's freshwater resources include wetlands, lakes, small rivers, and

3  streams. The Seashore's coastal and marine resources include Tomales Bay, a "Wetland of

4  International Importance" under the Ramsar Convention in 2002; Drakes Estero, the only West

5  Coast marine wilderness south of Alaska, and its several bays and inlets; and Bolinas Lagoon

6  and Bay. Point Reyes also supports four California Areas of Special Biological Significance

7  (ASBS), including Duxbury Reef and Point Reyes Headlands.

8      41.    The Seashore provides habitat for a rich array of wildlife, including dozens of

9  species of mammals, reptiles, and amphibians, and about 490 species of birds. Around 50 species

10  there are listed as threatened, endangered, or rare under the Endangered Species Act (ESA) and

11  other laws, including coho and Chinook salmon, steelhead, and snowy plovers.

12      42.    The Seashore is the only place within the National Park System where visitors can

13  observe tule elk, which roamed freely for millennia until being extirpated from the Seashore by

14  the 1860s through hunting and cattle ranching. In 1976, Congress required the Department of the

15  Interior to reintroduce tule elk to areas of California with suitable habitat, including the Seashore.

16  *See* Pub. L. No. 94-389, 90 Stat. 1189 (1976). Congress recognized that "the protection and

17  maintenance of . . . Tule elk in a free and wild state is of educational, scientific, and esthetic

18  value." *Id.* Pursuant to that law, tule elk were reintroduced to the Seashore in 1978.

19      43.    Three herds of tule elk currently exist in the park: the Drakes Beach herd that

20  roams between the Point Reyes Highlands, Drakes Beach Road, and ranches; the Limantour herd

21  that inhabits the wilderness areas and adjacent lands; and the Tomales herd that is confined to

22  2,600 acres behind a ten-foot-high, three-mile-long fence at Tomales Point in order to prevent

23  elk from inhabiting public lands used by ranchers.

24      44.    The Northern District of GGNRA is approximately 15,000 acres nestled between

25  Point Reyes Station and Bolinas in Marin County along the Bolinas Ridge. Lagunitas and Olema

26  Creeks are two major waterways there that drain into Tomales Bay at the northern edge.

27      **The Harmful Impacts of Ranching on Natural Resources on these Public Lands**

28      45.    Beef and dairy ranching have harmed and continue to harm the natural resources,

wildlife, scenery, and public use and enjoyment of the Seashore and GGNRA in many ways.

46.     Unlike livestock grazing on other federal public lands that typically occurs seasonally, NPS has allowed ranchers to graze and confine approximately 6,000 cattle year-round at Point Reyes and GGNRA. But grasslands there cannot support such intense use, so cattle typically require supplemental feed during fall and winter when forage growth is limited.

47.     Cattle grazing and other ranching activities impair water quality, alter stream channels and hydrology, compact riparian soils, reduce riparian and upland vegetation, and increase runoff, erosion, and sediment loads into water bodies. Water quality problems include excessive concentrations of fecal coliform and other bacteria—which can pose health and disease risks to humans and wildlife—along with turbidity, suspended solids, oxygen-depleting compounds, and nutrients. NPS has opined that bacterial and nutrient pollution associated with ranches are among the principal threats to the Seashore's water quality. In addition, ranching can consume more than 100 million gallons of water each year, which is largely extracted from sensitive and limited groundwater and surface water sources at the Seashore and GGNRA.

48.     Such impacts to water quality and quantity impair or eliminate important fish habitat components and adversely affect salmonids and other fish species. The Seashore and GGNRA contain threatened and endangered coho and Chinook salmon and steelhead trout as well as designated critical habitat for coho and steelhead. According to the National Marine Fisheries Service (NMFS), the population of Central California Coast coho salmon that spawns in the Lagunitas Creek watershed is the southernmost wild, independent population of coho salmon along the Pacific Coast and is critical to the survival and recovery of the species. Ranching has led to "degraded" habitat conditions for these species that threatens their survival.

49.     Grazing negatively impacts other wildlife species as well. Some ranchers seed non-native grasses and other plants to produce silage and forage, which displaces native species, and mow fields to increase forage for livestock, which kills, injures, and displaces small mammals and ground-nesting birds. Livestock operations support unnaturally dense populations of ravens, which are major nest predators for the endangered snowy plover.

50.     Grazing erodes soil and increases the abundance of invasive and non-native plant

species and decreases the abundance of native species, including those found in sensitive areas like coastal prairies, coastal dunes, wetlands, and riparian areas. After decades of grazing these lands, non-native species dominate grasslands at the Seashore. On numerous occasions, cattle have been found grazing in sensitive habitat areas, including Abbott's Lagoon.

51.     Ranchers rely on industrial equipment and infrastructure that harm the environment, natural resources, wildlife, scenic values, and public use. Ranchers use hundreds of miles of barbed wire and electric fencing that impede and harm wildlife, including tule elk, and prevent the public from accessing and enjoying large portions of public lands. Ranchers drive off-road vehicles to traverse grasslands and other sensitive terrain, which can compact and erode soils, trample vegetation, harm wildlife, and generate pollution.

52.     Dairy ranches include extensive infrastructure, including milking, loafing, and hospital barns; structures for milk storage and processing; drainage systems and lagoons that can impound more than 10 million gallons of manure and wastewater; and trucks and irrigation systems to dispose of manure and wastewater on fields. Notably, NPS has allowed ranchers to decide where to dispose of manure and wastewater at the Seashore and does not track how much manure and wastewater is disposed of each year. Dairies generally have higher densities of cows and produce much greater quantities of concentrated manure and water pollution and consume several times more water than beef operations.

53.     Most ranch allotments include "ranch complexes" with multiple residential buildings and trailers to house nearly 200 ranchers, employees, and their families. Residences rely on septic systems with tanks and leach lines for sewage disposal, and obtain water from springs or wells, although some ranchers receive water from NPS or a local utility.

54.     Ranches generate substantial traffic on Sir Francis Drake Boulevard, the Seashore's main public thoroughfare. Heavy trucks visit dairies daily to collect milk. Tanker trucks travel across roads and fields to dispose of manure on fields. Large hay trucks bring in supplemental feed when forage in fields is inadequate to sustain cattle. These vehicles degrade public roads, cause traffic jams, and pose safety concerns for visitors.

55.     Ranching operations impede and impair recreational opportunities for the public.

COMPLAINT – Page 13

1   The public is technically allowed to recreate on ranching pastures where cattle graze, but
2   misleading or erroneous signs, harassment and intimidation, fencing, a lack of public education,
3   cattle, and unpleasant sights and sounds often prevent such access. Moreover, cattle grazing
4   drives away other wildlife, reducing visitors' ability to enjoy viewing such wildlife.

5       56.    Although many impacts are caused by authorized activities, some impacts have
6   been caused by negligent or potentially intentional violations of ranching leases. Plaintiffs and
7   other members of the public have informed NPS that ranchers have allowed litter and debris to
8   accumulate on public lands, including one ranch that maintained a significant trash dump full of
9   rusted vehicles and equipment for years or possibly decades; that one rancher bulldozed several
10  hundred feet of native vegetation and soil into a creek that drains into Drakes Estero; that some
11  ranchers may maintain unauthorized livestock and crops for commercial purposes; and that many
12  ranchers have left cow carcasses to rot, which attracts ravens and pests.

13      **NPS's Failure to Timely Revise its 1980 General Management Plan**

14      57.    When the original RUOs and life estates expired—which mostly occurred in the
15  1990s and 2000s—NPS quietly began issuing leases that allowed ranching to continue without
16  first assessing the environmental impacts of doing so.

17      58.    By 2000, NPS had launched a public process to revise the GMP due to changed
18  conditions, and almost a decade later it announced that a draft GMP was ready for release. On
19  information and belief, NPS had completed internal policy reviews on a draft GMP and was
20  ready to release it to the public, but ranching and political influence sidelined this publication.

21      59.    Around 2014, rather than finishing its work to update the GMP, NPS began a
22  Ranch Comprehensive Management Plan/Environmental Assessment to meet ranchers' demands
23  for longer leases and an expansion of permitted activities to support their economic needs.

24      60.    On February 10, 2016, Plaintiffs filed a lawsuit against NPS, challenging the
25  agency's longstanding failure to timely revise its 1980 GMP and its decisions to authorize
26  ranching without ever analyzing its impacts. *RRI v. NPS*, No. 3:16-cv-00688-SBA, ECF No. 1
27  (N.D. Cal. Feb. 10, 2016). After the district court denied NPS's motion to dismiss, Plaintiffs,
28  NPS, and intervenors—two groups of ranchers and Marin County—reached a settlement in 2017

1    that required NPS to prepare a GMP amendment (GMPA) covering the lands leased for ranching

2    along with an environmental impact statement. *Id.*, ECF No. 143. NPS committed to studying no

3    ranching, reduced ranching, and no dairying alternatives in the EIS, and the settlement allowed

4    NPS to issue interim 5-year ranch leases while the planning process was taking place. *Id.* at 6–7.

5                **The Listing of the Historic Dairy Districts**

6           61.    In July 2017, the Acting Superintendent of the Seashore nominated two historic

7    districts for inclusion on the National Register of Historic Places: the Point Reyes Dairy Ranches

8    Historic District and the Olema Valley Dairy Ranches Historic District.

9           62.    The Point Reyes Dairy Ranches Historic District is comprised of 17 ranch areas

10   and covers most of the Point Reyes Peninsula. The Olema Valley Dairy Ranches Historic

11   District is comprised of 19 historic ranch areas located in the eastern portion of the Seashore and

12   the northern end of GGNRA. The Olema Valley Dairy Ranches Historic District was added to

13   the National Register in April 2018, and the Point Reyes Dairy Ranches Historic District was

14   added in October 2018.

15          63.    With the exception of the Percy, Niman, and Martinelli ranches, all of the ranches

16   remaining at the Seashore and Northern District of GGNRA are located within either the Point

17   Reyes or Olema Valley Dairy Ranches Historic District.

18          64.    The two districts are listed as historically significant because of their association

19   with the history of dairy ranching in Marin County from the mid-1800s through the 1950s and

20   because they contain buildings and structures that reflect that history.

21          65.    The approved nominations for both districts discuss how most of the dairies at the

22   Seashore and GGNRA were relatively small dairies that milked between 100 and 250 cows at the

23   end of the period of significance in the 1950s. In recent years, the dairies remaining at the

24   Seashore have milked approximately 200 to 400 cows, but are authorized for even more.

25          66.    The approved nominations for both districts discuss how the "death knell" for

26   most of the dairies in the districts was the advent of strict water quality laws in the 1970s. The

27   dairies that remained in business—including the dairies that are still operating at the Seashore—

28   had to install new structures and make other capital improvements in order to comply with the

1   new water quality laws. Those structures and improvements do not contribute to the historic

2   character of the districts.

3   **NPS's Planning Process and Proposed GMPA**

4   67.    Prior to preparing its EIS for the new GMPA, NPS sought public comment about

5   significant issues and potential alternatives to consider and received thousands of public

6   comments in response.

7   68.    NPS published a draft EIS in August 2019, and a final EIS in September 2020 that

8   studied six alternatives for managing approximately 28,000 acres in the Seashore and GGNRA.

9   Each alternative included strategies to preserve natural and cultural resources and to manage

10  infrastructure, visitor use, ranching, and tule elk. The EIS also included proposed desired

11  conditions for natural resources that would be part of the GMPA.

12  69.    Alternative A was the "no action" alternative that would continue existing

13  management under the 1980 GMP. Under this alternative, NPS would issue new five- or ten-year

14  leases/permits for existing beef and dairy ranches on approximately 27,000 acres. The EIS

15  revealed that 7,600 acres of this area were not zoned for such use under the 1980 GMP, thus

16  admitting that nearly a quarter of the ranching that NPS had authorized for decades violated the

17  1980 GMP.

18  70.    Alternative B—NPS's "preferred alternative" and "proposed action"—would

19  expand lands zoned for ranching under the 1980 GMP by about 7,000 acres for a total of 28,100

20  acres under the GMPA: a 33% increase. Within this so-called ranchland zone, NPS would create

21  subzones: 16,900 acres for range, where only cattle grazing could occur unless NPS decided to

22  allow other activities in that zone; 9,000 acres for pasture, where a suite of vegetation

23  management activities such as seeding, mowing, manure dumping, and forage and silage

24  production[1] could occur, along with some new commercial activities; 220 acres for the ranch

25  core, where 18 residentially-occupied ranch complexes and most new commercial activities and

26

27  _____

[1] Forage and silage production are intensive activities that include seedbed preparation, manure
spreading, seeding—typically of non-native plants—and harvest mowing to provide feed for

28  livestock. Silage is cut earlier in the season than forage and is wetter.

new infrastructure would occur; and 2,000 acres for resource protection, where ranching activities would supposedly be prohibited unless NPS decided to allow an undefined amount of targeted grazing and other management activities. The GMPA would devote 600 acres, or only 3% of the planning area, to other purposes within a scenic landscape zone.

71.     Alternative B included almost everything that ranchers demanded: 20-year leases, quadruple the length of existing leases; expansion possibilities for poultry farming and other livestock, crops, processing facilities, and other commercial activities; lethal control of the Drakes Beach tule elk herd, based on a population cap of 120 animals that would likely require killing 12–18 elk each year; lethal control for the Limantour tule elk herd if elk traveled beyond their core area and established new herds or concentrated on ranchlands; and a generous succession policy that would offer the current leaseholders—many of whom are descendants of prior landowners—new leases at the expiration of old ones, paving the way for ranching to continue in perpetuity. NPS would also allow current, intensive livestock levels: 2,400 AUs[2] of beef cattle and 3,115 dairy animals.

72.     Alternative C was identical to Alternative B with one exception: NPS would lethally remove the *entire* Drakes Beach tule elk herd.

73.     Under Plaintiffs' settlement with NPS, NPS was required to study different alternatives to reduce ranching, eliminate dairying, and phase out ranching. For the reduced ranching alternative in the EIS, Alternative D, NPS did not choose to reduce ranching based on maximizing the protection of the environment or natural resources. Instead, NPS proposed to reduce ranching by eliminating grazing-only leases that lack a ranch complex or substantial infrastructure on approximately 7,500 acres while otherwise allowing existing operations to continue. For the no-dairying alternative, Alternative E, NPS proposed to give dairy operations five years to close or convert to beef ranching. Alternative F, the restoration alternative, would

---

[2] NPS defines an "animal unit" (AU) as one mature (1,000 pound) cow with or without a calf up to 1 year old or the equivalent based on the average daily forage consumption of 26 pounds of dry matter per day. NPS uses AUs to authorize beef ranches but employs a per-head limit for most dairy operations.

discontinue all ranching operations within five years, increase opportunities for visitors to use and enjoy these public lands, and remove the elk fence from Tomales Point.

74.     For Alternatives B through E, ranchers would be required to sign a generic lease with standard terms and conditions. Ranch-specific details, including AU or cattle limits, any new commercial activities, maps delineating subzones, maintenance requirements, and mitigation measures, would be included in a separate ranch operating agreement (ROA). NPS would negotiate these details with ranchers but would not conduct any environmental analysis or accept public comment for ROAs, with the exception of a few types of potential commercial activities, before doing so. NPS would revisit the ROAs and allow for changes annually.

75.     For each of the action alternatives, the EIS provided little detail about activities that would support public uses. NPS explained that public use projects would occur "over time" and "subject to available funding" but did not provide any certainty that NPS would complete projects, maintenance, or other work to benefit public use and enjoyment.

76.     In contrast, the EIS assumed that NPS would undertake a substantial amount of new work to facilitate projects that would benefit ranchers, including lethal control and hazing of tule elk herds, new commercial activities, new infrastructure projects, and more. NPS did not question its ability to handle this additional workload, even though the agency has failed to effectively monitor and manage ranch leases in past years.

77.     During the planning process, NPS received thousands of public comments. Of the commenters who supported a specific alternative, approximately 91.4% of commenters opposed ranching on various grounds, while only 2.3% of commenters supported NPS's preferred alternative to continue ranching operations.

78.     Plaintiffs and their members, supporters, and allies submitted detailed comments at every opportunity during the planning process. Plaintiffs flagged substantial deficiencies in the agency's analysis, provided documentation of on-the-ground problems and impacts associated with ranching, asked numerous questions about potential impacts and NPS's plans, and called on NPS to phase out ranching and restore former ranchlands for public use and inspiration.

79.     Other federal and state agencies also provided critical comments to NPS on the

EIS. The U.S. Environmental Protection Agency (EPA) urged NPS to analyze the water usage of proposed activities and consider the impact of climate change on future water supply. The San Francisco Regional Water Quality Control Board (Water Board) was also critical of the agency's water quality analysis, urged NPS to consider the technical and financial feasibility of the proposed mitigation measures, and revealed that implementation of best management practices at ranches have been inadequate to stop exceedances of state water quality standards.

80.     NPS did not fully address or respond to many of the comments submitted by Plaintiffs, other members of the public, and other agencies. The final EIS made limited changes to the DEIS and the proposed action despite overwhelming demand for NPS to choose a different alternative and to better disclose and evaluate impacts of ranching.

**The EIS's Incomplete Baseline Discussion and Impact Analysis**

81.     The EIS for the GMPA purported to analyze the impacts of the six alternatives on water resources, tule elk, vegetation, cultural resources, socioeconomics, and other resources. But the EIS was incomplete or inaccurate in several overarching ways, particularly related to the analysis of the impacts from Alternative B, the proposed GMPA.

82.     First, the EIS did not fully describe the environmental baseline of the planning area. The EIS included broad and general information about resources across the planning area. It largely excluded site-specific information about natural and cultural resources, existing ranch infrastructure and operations, and past monitoring and compliance issues for each ranch.

83.     For example, for cultural resources, NPS focused almost exclusively on the history of ranching, nearly ignoring cultural resources and history related to the Coast Miwok's presence at the Seashore since time immemorial. NPS used a lack of baseline information to decline a detailed analysis of effects on archaeological resources, stating in an appendix to the EIS that the small number of known resources located in the planning area did not warrant such an analysis. But the EIS did not disclose that the 72 Native American archaeological sites which comprise the Indigenous Archaeological District likely constitute only a small fraction of the sites at the Seashore (and in the planning area), because only 6% of the Seashore has been intensively surveyed for archaeological resources.

84.     The EIS also included little baseline information about water resources, particularly for the Pacific Drainages, the ASBS areas, and Drakes Bay watershed and wilderness area. It included less than a page about baseline conditions for water quantity issues, and included conflicting information about the amount of water that ranches consume. Although it admitted ranchers may use more than 100 million gallons per year, the EIS did not identify the specific surface water and groundwater sources that supply such large quantities of water.

85.     Second, the EIS did not analyze or disclose the impacts of proposed ranching operations at a site-specific level for each of the 31 ranching allotments. The EIS did not include specific details about the operations, infrastructure, or natural resources at each ranch. But the EIS nonetheless asserted that additional NEPA analysis would not be required prior to issuance of 20-year leases or implementation of most ranching activities.

86.     This lack of site-specific analysis for ranching alternatives stemmed, in part, from deferring critical decisions about the scope and details of each ranch's operations—including the actual number of cattle and other livestock allowed, which new commercial operations and management activities could occur, and what maintenance and mitigation measures would be required—until NPS negotiates ROAs with each rancher. The environmental impacts of many of those key decisions will not be disclosed to the public or analyzed in another NEPA analysis.

87.     Third, the EIS assumed that a new subzoning framework—which would allow different ranching activities in pasture, ranchland, and ranch core subzones—along with mitigation measures and management activities would reduce impacts from the baseline. But NPS has yet to formally determine where all subzones are located through on-the-ground verification of ranches and resources. The EIS did not explain how and when NPS would delineate all boundaries for subzones or other exclusion areas *on the ground* to ensure that cattle or other livestock and activities are contained in the proper subzone. The EIS also did not evaluate whether subzoning would be effective, which is a particular concern given that existing barriers have not prevented cattle from grazing in off-limit areas.

88.     The EIS also failed to evaluate the generic mitigation measures included in its attached appendices, or consider their effectiveness or feasibility. Many have yet to be developed

or defined, making it uncertain what measures will ultimately be required, whether they will be effective for site-specific conditions at each ranch, and whether they will provide the maximum protection for the natural environment as a whole. The EIS also failed to address other measures that would provide greater protection to natural resources, such as prohibiting silage mowing during bird nesting season and prohibiting cattle from entering all surface waters and wetlands.

89.     The EIS simply asserted that mitigation measures would be implemented and effective, even though full implementation may take years and is dependent on funding and priorities. It is uncertain how much funding ranching leases will generate, since NPS has yet to conduct a new appraisal process that will purportedly establish fair market value of the leases after decades of collecting below-market lease payments. And it is unknown whether NPS will secure the additional funding that is needed from internal and external sources.

90.     Fourth, the EIS provided little information about the expected impacts of climate change and largely ignored how ranching will exacerbate these effects, even though NPS has recognized that climate change poses one of the greatest threats in the Seashore's history. Most notably, the EIS largely ignored that climate change is expected to exacerbate water quality and quantity problems, assuming instead that tens of millions of gallons of water would continue to be available for ranching consumption each year.

91.     Finally, the EIS focused on many benefits of ranching and the proposed GMPA while downplaying or ignoring adverse impacts for numerous resources, including the following:

92.     For water resources, although NPS has completed little monitoring of water quality over the past decade and none in the past few years, the EIS claimed improvements in water quality had occurred and would continue to occur while ignoring that the data has revealed chronic violations of state water quality standards. Neither did the EIS evaluate whether or how ranches would comply with state water quality standards. Instead, the EIS claimed that the GMPA would reduce pollution compared to the baseline without specifying by how much or how long such reductions would take.

93.     For tule elk, NPS touted the benefits of its 120-elk population cap for the Drakes Beach herd, which was purportedly chosen to keep the Drakes Beach herd viable while ensuring

COMPLAINT – Page 21

adequate forage for cattle on nearby ranches. But in choosing that population threshold and analyzing the issue of forage competition between tule elk and cattle, the EIS used a numerical model that relied on several baseless or incorrect assumptions, including that the animals are evenly distributed throughout the study area. The EIS also discussed the issue of Johne's disease[3] very briefly and without analyzing whether additional mitigation measures related to manure management might protect tule elk from its spread.

94.     For grasslands, the EIS admitted that livestock grazing would perpetuate existing, significant problems with invasive species while ignoring that this would fail to achieve the GMPA's desired condition to limit invasive species. The EIS also focused on specious claims that livestock grazing is needed to maintain grasslands, while brushing aside the substantial benefits to wetlands, coastal dunes, and coastal prairie if ranching is reduced or removed.

95.     For public use and enjoyment, the EIS provided only a cursory analysis of the impacts of ranching, largely ignoring important issues such as potential safety risks from cattle, industrial traffic, and manure disposal. The EIS also unreasonably assumed that public visitation levels would remain flat if NPS restored public use to the 28,000 acres that are currently devoted to private, commercial uses.

96.     As a result of these and other issues, the EIS did not fully or accurately analyze the impacts of the proposed alternatives upon many resources and recreational uses of the Seashore and GGNRA.

**Water Quality Issues and Developments**

97.     During and after NPS's preparation of the EIS, several significant developments related to water quality issues at the Seashore and GGNRA arose.

*Regional Water Board Regulation and Compliance*

98.     Throughout the EIS and planning process, NPS relied heavily on the Water Board's regulation of ranches to address water quality impacts and concerns.

---

[3] Johne's disease is a diarrheal wasting disease of livestock and wild ungulates caused by the bacteria *Mycobacterium paratuberculosis*.

COMPLAINT – Page 22

99.     The Water Board has adopted a Water Quality Control Plan for the San Francisco Basin (Basin Plan) that designates beneficial uses—including groundwater recharge, water contact and noncontact recreation, cold and warm freshwater habitat, and wildlife habitat—along with water quality objectives for surface water and groundwater in the planning area. Water quality objectives include narrative and numeric standards for bacteria, temperature, turbidity, dissolved oxygen, nitrates, and other parameters.

100.     Beef ranches on lands that drain to Tomales Bay are subject to a Conditional Waiver of Waste Discharge Requirements for Grazing Operations in the Tomales Bay Watershed, Order No. R2-2018-0046 ("the Conditional Waiver"). The Water Board issued the Conditional Waiver in 2018 as part of its efforts to address water quality impairments for pathogens and sediment in Tomales Bay and its major tributaries, including Lagunitas Creek, through Total Maximum Daily Loads (TMDL)[4] under the CWA. The Conditional Waiver requires covered dischargers to, *inter alia*, comply with water quality objectives in the Basin Plan and not cause or contribute to exceedances of any water quality standards, and to submit annual certifications that provide information about inspections completed, water quality problems, and other actions required.

101.     In November 2020, NPS's range manager signed and submitted annual certifications for the beef ranches but did not report that all of the required inspections were conducted during the dry and wet seasons. The certifications also revealed that additional management practices are needed to improve water quality for the grazing operations but lacked the required detail about the problems and remedies taken to correct those problems.

102.     The Water Board regulates discharges of waste from confined animal facilities, including dairies, under the General Waste Discharge Requirements for Confined Animal Facilities Within the San Francisco Bay Region, Order No. R2-2016-0031 ("CAF Order"). This CAF Order prohibits, *inter alia*, dairies from causing or contributing to an exceedance of any applicable water quality objective in the Basin Plan. To obtain coverage, the CAF Order required

---

[4] Section 303(d) of the CWA requires a TMDL, which establishes the maximum amount of a pollutant allowed in a waterbody, for waterbodies that do not meet water quality standards.

dairies that had been covered under the Water Board's Conditional Waiver of Waste Discharge Requirements for Existing Dairies—which expired in June 2020—to enroll by submitting a notice of intent form by September 1, 2020.

103.    On information and belief, the dairies at Point Reyes were covered under the Conditional Waiver of Waste Discharge Requirements for Existing Dairies, but multiple dairies submitted notices of intent to be covered after the September 2020 deadline in the CAF Order. In those notices of intent, some dairies reported that they confine dozens more cattle and have access to thousands of additional acres for manure disposal than the EIS disclosed.

*California Coastal Commission*

104.    In October 2020, NPS prepared a Coastal Consistency Determination (CD) for the California Coastal Commission (CCC) that purported to explain why the proposed GMPA was consistent to the maximum extent practicable with the California Coastal Act of 1976, as required under the Coastal Zone Management Act.

105.    The CCC's staff disagreed with NPS and found that the GMPA was inconsistent with state coastal laws and policies for marine resources and water quality. They found the lack of water quality monitoring was "concerning" and that available data showed violations of water quality standards, particularly for streams that drain to Drakes Estero and the Pacific Ocean. Staff faulted NPS for not proposing adequate measures to address these issues and for lacking a plan to ensure that promised actions result in compliance with water quality standards.

106.    After receiving nearly 45,000 comments nearly all of which urged the CCC to find the GMPA inconsistent with state coastal laws and policies, the CCC narrowly issued a conditional concurrence with NPS's CD on April 22, 2021. The CCC required NPS to develop a new water quality plan that includes a new strategy for improving and monitoring water quality on a set timeline *before* NPS issues new ranching leases, along with a climate action plan that addresses greenhouse gas emissions from ranching.

*Water quality monitoring*

107.    In January 2021, Plaintiff WWP hired a third-party expert engineer to conduct water quality monitoring of drainages at the Seashore's dairy and beef cattle ranches—including

those that have implemented best management practices to reduce water pollution. The expert concluded that "[b]acteria contamination of surface water significantly exceeds applicable water quality criteria despite the reported implementation of cattle waste management actions." These exceedances pose "[i]mminent human health risks," particularly in places where people are likely to have direct water contact.

108.    In response, the April 2021 Water Board's Executive Officer Report found that WWP's sampling appeared to be of "good quality," concurred that water quality "is poor despite existing pollution prevention ranch practices," and concluded that "additional progress is needed to meet water quality standards during every season and in all sample locations."

*Drought*

109.    In December 2020, Marin County passed a resolution declaring an agricultural emergency drought that was retroactive to January 2020. The resolution declared that the drought was "very dire and is becoming even more grim as holding ponds across the county reach critically low levels."

110.    That fall, NPS prepared an "emergency" water use application to pump water from Kehoe Creek because J Ranch had run out of water to clean its milking facilities and support its dairy cows. Notably, a similar "emergency" occurred just a few years before, with NPS allowing pumping of Kehoe Creek during the 2013–2015 drought.

111.    In May 2021, Marin County issued a county-wide drought emergency after experiencing the lowest rainfall in a 16-month period since 1880.

112.    That spring, the operator of the oldest and largest dairy on the Seashore—Robert McClure—announced that he had sold his dairy cattle and closed his dairy at I Ranch due to dwindling surface water and a groundwater aquifer that stopped recharging. At that point, the ongoing drought in Marin County was worse than any other since 1977. Nevertheless, he announced plans to retain his lease to raise heifers at the Seashore to support his Petaluma ranch.

113.    On information and belief, these drought conditions have prompted ranchers to truck in unknown amounts of water along with hay to support their operations. This increases traffic, greenhouse gas emissions, and other air emissions at the Seashore. Yet the NPS has not

considered these impacts, nor required ranchers to curtail water usage to protect water resources—which include salmon-bearing streams, wetlands, and groundwater—during drought.

**Endangered Species Act Consultation**

114.    On March 18, 2021, NMFS issued a Biological Opinion (BiOp) that found the proposed GMPA is likely to adversely affect Central California Coast coho salmon, steelhead trout, and Chinook salmon—species listed under the ESA. NMFS concluded that the recovery of these populations at the Seashore and GGNRA "depend upon programs that protect and restore aquatic habitats in watersheds and the continued reduction of impacts from land use and water withdrawal." NMFS ultimately found that the GMPA will not jeopardize the continued existence of the fish populations. However, NMFS included certain mandatory actions—"reasonable and prudent measures" and associated "terms and conditions"—in the BiOp to ensure that NPS minimizes the amount of harm caused by the GMPA to ESA-listed fish. These required actions include ensuring that riparian fences—in the limited areas they exist—are maintained and repaired in a timely fashion to prevent cattle from accessing streams where salmonids are found.

115.    On June 4, 2021, the U.S. Fish and Wildlife Service (FWS) issued a BiOp that found the proposed GMPA is likely to adversely affect California red-legged frog, western snowy plover, Myrtle's silverspot butterfly, beach layia, Sonoma Alopecurus, and the Sonoma spineflower, all species listed under the ESA. The FWS BiOp included mandatory reasonable and prudent measures and associated terms and conditions to reduce the impacts of the GMPA on ESA-listed species. Notably, these required NPS to develop a "raven management program" to help reduce raven predation and thereby protect snowy plovers and include raven control measures in ROAs/leases.

**NPS's Record of Decision**

116.    On September 13, 2021—exactly 59 years after President Kennedy signed the Point Reyes Act into law—NPS issued the ROD adopting the GMPA based on Alternative B, the proposed action in the EIS, with minor modifications. The ROD included a nonimpairment determination under the Organic Act, revealing for the first time why NPS believes continuing ranching at the Seashore and GGNRA is consistent with the agency's legal duties.

117.    The same day, the Point Reyes National Seashore Superintendent signed a Succession Policy outlining NPS's procedures for making leasing decisions at the Seashore and GGNRA, which the ROD referenced extensively.

*Modified Alternative B*

118.    Under the modified Alternative B adopted in the ROD, and due to the recent closure of I Ranch, NPS will allow five dairies with approximately 2,425 dairy cattle to operate at the Seashore. This would modestly reduce the acreage devoted to manure management and forage production and add the 580-acre Allotment 4 to the scenic landscape zone. But the ROD did not address whether NPS had accepted the McClure's plans to maintain a lease at I Ranch for raising heifers.

119.    The ROD also announced that NPS will require the remaining dairies, through their initial ROAs, either to modernize manure management practices and infrastructure, convert to beef operations, or cease dairy operations. But the ROD provided no detail about the dairy modernization requirement, and the EIS did not disclose that any dairy practices or infrastructure are outdated, making the scope and effect of this new requirement unclear.

120.    For beef operations, the ROD required NPS to convert a 259-acre grazing pasture in GGNRA to seasonal grazing and discontinue 280 acres of forage production on beef ranches.

121.    The ROD announced that the GMPA would allow ranchers to add, as part of their initial ROAs, dozens of sheep or goats to their livestock operations, and begin farm stays or ranch tours without additional analysis under NEPA. Ranchers could also propose a suite of new commercial activities—including chickens, irrigated row crops, processing facilities for dairies, and mobile slaughterhouses—for NPS to consider and analyze further.

122.    For tule elk, NPS increased the population threshold for the Drakes Beach herd from 120 to 140 without explanation. NPS also promised to coordinate its elk management with the Federal Indians of the Graton Rancheria (FIGR), the federally-recognized tribe in the area.

123.    NPS added and modified some mitigation measures that must be included in the initial ROAs to address, among other things, terms and conditions of the BiOps and additional requirements from other agencies. NPS would also adopt a new water quality strategy along with

a climate action strategy as required by the CCC. But NPS did not develop or adopt these plans—including the raven management program required by FWS—prior to the ROD, making their scope, effectiveness, and environmental impacts unclear.

*Primary justifications for the GMPA*

124.    The ROD provided a few key reasons for adopting modified Alternative B.

125.    First, the ROD claimed that the chosen scheme will improve natural resource conditions compared to current conditions due, in part, to the new zoning framework, even though only 3,200 acres are protected from ranching's impacts in the resource protection or scenic landscape zones while the remaining 25,500 acres are zoned for ranching uses. NPS claimed that the 2,000-acre resource protection zone includes "known sensitive resources such as listed species and riparian areas" and that intensive activities would be limited to pasture and ranch core subzones, which supposedly lack sensitive resources.

126.    But the EIS admitted that sensitive resources *are* located in the range zone, which includes 81% of the planning area's wetlands and 65% of the riparian forests/shrublands that support sensitive resources, and in the pasture zone, which includes 27% of the planning area's coastal prairie and 3% of coastal dunes that support a diversity of sensitive species. Other uncertainties about when, where, and how NPS would implement subzones and exclude cattle in areas make any potential benefits unknown and questionable. Further, the ROD ignored that activities in the ranch core can have an outsized impact on sensitive resources *outside* of that subzone, particularly related to water pollution and consumption.

127.    Second, the ROD stated that the chosen alternative's continuation of ranching would support cultural resources and the Olema Valley Dairy Ranches and Point Reyes Peninsula Dairy Ranches Historic Districts. The ROD concluded that continuing ranching is the preferred preservation treatment and explained that NPS's agreement with FIGR to help manage elk and ranchlands would support preservation of cultural resources.

128.    Neither the ROD nor the EIS grappled with the fact that modern ranching— particularly modern dairying—is fundamentally different than ranching as it was practiced during the Historic Districts' period of significance. The chief reason why most of the prior

1    dairies closed in the 1970s was the imposition of strict water quality standards; dairies that
2    remained were forced to make changes to comply with those standards that made their operations
3    look very different than they had looked during the period of significance. NPS did not
4    acknowledge this, nor did it explain how the new modernization requirements that will be
5    imposed on dairies—which will include the installation of even more infrastructure for manure
6    and nutrient management—are compatible with the desire to evoke a bucolic past on the ranches.

7    129.    The ROD's conclusion that discontinuing or reducing ranching at the Seashore
8    and GGNRA would result in adverse impacts to the Historic Districts echoed the conclusions of
9    the EIS. But the EIS did not justify those conclusions; it simply *assumed* that reducing or
10   eliminating ranching would lead to adverse effects to the Districts, including a change in the
11   characteristic vegetation of the pasturelands, without considering viable alternative methods of
12   preservation. NPS neither considered other potential uses for ranch buildings and infrastructure
13   nor addressed evidence indicating that an expanded tule elk population could preserve the
14   character of the ranches by grazing pastures currently grazed by cattle.

15   130.    Finally, the ROD argued that ranching remains an "appropriate use of park
16   lands"; that the proposed action "furthers Congress's interest in seeing ranching continue in the
17   planning area"; and that multi-generational ranching is consistent with Congressional intent. The
18   agency based its conclusion about Congressional intent largely on a selective reading of the
19   legislative history of the Point Reyes Act along with "recent reaffirmation of Congressional
20   support for ranching." But these isolated pieces of legislative history do not overcome the plain
21   language of the Act, which does not endorse continued ranching in perpetuity.

22   **NPS's Nonimpairment Determination**

23   131.    Pursuant to its duties under the PRNS and Organic Acts, NPS analyzed whether
24   the GMPA would impair the resources of the Seashore and GGNRA. The ROD determined that
25   NPS's adoption of modified Alternative B as the new GMPA would not impair water quality and
26   quantity, vegetation, elk, cultural resources, and other resources that NPS analyzed.

27   132.    The ROD reasoned that the GMPA would improve conditions and reduce impacts
28   to these resources compared to current conditions. But this comparative analysis did not address

whether or how these purported changes will be enough to prevent impairment and comply with desired conditions or other resource standards.

133.    The ROD also repeated many of the EIS's specious conclusions and relied on key parts of its incomplete and inadequate analysis, and largely ignored or brushed aside new evidence that arose after the completion of the EIS.

134.    For example, for water resources, the ROD restated the EIS's finding that water quality has improved in recent years, brushing aside the agency's own (limited) monitoring and expectation that adverse impacts to surface and groundwater quality from nutrients, pathogens, sediment, and other pollutants will occur and potentially be long-lasting. It also failed to address reports from the CCC and the Water Board that limited improvements and best management practices have not stopped violations of applicable water quality standards. Despite such evidence, neither the ROD nor the EIS addressed whether the new GMPA and its mitigation measures would ensure ranching comes into compliance with state water quality standards.

135.    And for water quantity, the ROD concluded that water would be available to support ranching in the future because it *has been* available in the past, ignoring climate change and that increasing drought and dwindling water supplies were inadequate to support existing ranching levels just before the ROD was signed.

136.    For tule elk, the ROD did not explain why keeping the Drakes Beach herd at 140 individuals rather than some higher population level will better prevent impairment of other resources, nor did the ROD offer any meaningful analysis of how changed conditions since the issuance of the EIS might affect the need for lethal removal of tule elk.

137.    The ROD also claimed that NPS need not consider, as part of its nonimpairment determination, impacts to visitor use, experience, and access, even though its own policies require the opposite.

**ROD Implementation**

138.    Interim leases issued to ranchers under the *RRI v. NPS* settlement will expire in mid-July 2022. On information and belief, NPS intends to commit substantial resources and time in order to issue new 20-year leases for ranchers under the ROD before those leases expire.

139.     Before issuing new leases for ranchers, NPS must also negotiate individual ROAs for approximately 24 different ranchers, which will entail: 1) conducting on-the-ground surveys to delineate the boundaries of the subzones for each of the 30 ranching allotments; 2) identifying infrastructure and investment commitments for practices that support natural and cultural resource protection, including deferred maintenance and upkeep of more than 100 historic structures and determining which management activities, practice standards, and mitigation measures apply to each rancher's operations; 3) determining how many cattle or other livestock may be confined within each ranch; 4) identifying necessary measures to modernize manure management infrastructure and practices; 5) analyzing ranchers' proposals to expand their commercial activities; 6) considering whether proposed farm stays have sufficient water to avoid unacceptable impacts; and 7) identifying operational adjustments to support tule elk where conflicts with ranches occur. NPS must also conduct or commission up-to-date appraisals to bring leasing rates for ranches up to market rates.

140.     One of the major reasons for NPS's decision to issue 20-year leases as opposed to shorter leases was to give the Point Reyes ranchers greater security, allowing them to more easily obtain loans to make capital investments. On information and belief, Point Reyes ranchers intend to, and will, rely upon the new 20-year leases to secure loans and make investments in new facilities for diversification activities or expanded ranching operations.

141.     On information and belief, NPS may undertake lethal tule elk control actions under the unlawful ROD and EIS during the pendency of this case.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF POINT REYES ACT AND APA**

142.     Plaintiffs hereby reallege and incorporate by reference the preceding paragraphs.

143.     This first claim for relief challenges NPS's ROD and GMPA for violating the Point Reyes Act, 16 U.S.C. § 459c *et seq*. This claim for relief is brought under the APA, 5 U.S.C. §§ 701–706(2).

144.     Congress established Point Reyes National Seashore "for purposes of public recreation, benefit, and inspiration…." 16 U.S.C. § 459c. The Point Reyes Act requires NPS to

COMPLAINT – Page 31

1  administer the National Seashore "*without impairment of its natural values*, in a manner which

2  provides for such recreational, educational, historic preservation, interpretation, and scientific

3  research opportunities as are *consistent with, based upon, and supportive of the maximum*

4  *protection, restoration, and preservation of the natural environment within the area*," unless

5  otherwise provided. *Id.* § 459c-6(a) (emphasis added). Although the Point Reyes Act allows NPS

6  to lease property that was agricultural prior to acquisition, those leases must be "subject to such

7  restrictive covenants as may be necessary to carry out the purposes of" the Act. *Id.* § 459c-5(a).

8       145.    The ROD and GMPA are inconsistent with the Act in several ways.

9       146.    First, NPS unlawfully placed protection of historic dairying districts on par with

10  or above protection of the natural environment and recreational uses of the National Seashore.

11  The ROD and GMPA allow NPS to authorize and expand ranching operations despite evidence

12  that ranching has harmed and will continue to harm water quality and quantity, native grasslands

13  and other sensitive vegetation types, tule elk restoration, other wildlife, and recreational uses. In

14  so doing, NPS rejected mitigation measures and alternatives that would provide stronger

15  protections for the environment and public uses of the Seashore—most notably, Alternative F,

16  the restoration alternative. In reaching this decision, NPS incorrectly interpreted the Point Reyes

17  Act by equating that law's duty to provide for the "maximum protection, restoration, and

18  preservation of the natural environment" with the Organic Act's nonimpairment mandate.

19       147.    Second, NPS unlawfully prioritized private, commercial needs above "public

20  recreation, benefit, and inspiration"—the overarching purposes of the Act, 16 U.S.C § 459c. NPS

21  did so by, *inter alia*, requiring lethal control of tule elk instead of curtailing ranching operations,

22  allowing ranching to impede and displace public uses of public lands across a large swath of the

23  Seashore, and fast-tracking measures—including expanded commercial operations—to benefit

24  ranches while sidelining projects that would benefit public recreation and inspiration.

25       148.    Finally, the ROD determined that ranching remains an appropriate use of the

26  Seashore based on an erroneous interpretation of the Point Reyes Act. The ROD stated that

27  Congress has, for decades, intended multi-generational ranching at the Seashore to continue. But

28  this assertion is inconsistent with the plain language of the statute, which did not establish

ranching as a purpose of the Seashore and did not even encourage NPS to issue leases for ranching. Instead, the Act allowed NPS to offer initial leases to prior landowners. But it did not provide a similar preference for subsequent leases to the descendants of those original landowners in perpetuity. Thus, the ROD's determination that ranching should continue under its adopted Succession Policy that gives preference to current leaseholders and their descendants was arbitrary and capricious and contrary to the Point Reyes Act.

149.   For these reasons, NPS's ROD and GMPA are arbitrary, capricious, an abuse of discretion, and contrary to the Point Reyes Act and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D). These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their supporters, members, and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF ORGANIC ACT & REGULATIONS

150.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 141, inclusive.

151.   This second claim for relief challenges the ROD and GMPA for failing to comply with the Organic Act, 54 U.S.C. § 100101 *et seq.*, and its implementing regulations, 36 C.F.R. § 1.1 *et seq.* This claim for relief is brought under the APA, 5 U.S.C. §§ 701–706(2).

152.   The Organic Act requires NPS to regulate use of the Seashore and GGNRA to conserve and provide for the public's enjoyment of scenery, natural and historic objects, and wildlife, and to leave such resources "unimpaired for the enjoyment of future generations", 54 U.S.C. § 100101(a), by, *inter alia*, prohibiting uses that cause "unacceptable impacts." 2006 NPS Management Policies, §§ 1.4.3.1, 1.4.4, 1.4.7.1.

153.   NPS may authorize livestock grazing when such "use is not detrimental to the primary purpose for which" the Seashore and GGNRA were created. 54 U.S.C. § 102101(a)(2). But NPS's policies declare that the agency "will phase out the commercial grazing of livestock whenever possible…." 2006 NPS Management Policies § 4.4.4.1.

154.    The Organic Act allows NPS to destroy animals, provided they are "detrimental to the use of" the Seashore or GGNRA. 54 U.S.C. § 100752.

155.    Consistent with these obligations, the Park Service's regulation that governs its issuance of permits for uses such as livestock grazing requires that such permits be consistent with other federal laws, and "based upon a determination that public health and safety, environmental or scenic values, natural or cultural resources, scientific research, implementation of management responsibilities, proper allocation and use of facilities, or the avoidance of conflict among visitor use activities will not be adversely impacted." 36 C.F.R. § 1.6(a). NPS's regulations also prohibit the introduction of plants into System units. 36 C.F.R.§ 2.1(a)(2).

156.    The ROD and the GMPA violated the Organic Act and its regulations in numerous respects, including but not limited to the following:

    A.  Relying on an inadequate analysis and irrational explanations to support the nonimpairment determination—particularly for water quality and quantity, vegetation, tule elk, wildlife, and cultural resources—which was inconsistent with evidence that shows that ranching impairs or threatens to impair resources and public uses at Point Reyes National Seashore and GGNRA;

    B.  Failing to consider whether the GMPA would impair visitor use, experience, and access based on an erroneous interpretation of NPS's own policies;

    C.  Arbitrarily determining that continued and expanded beef and dairy ranching is necessary to protect the historic dairying districts at Point Reyes National Seashore and GGNRA without fully and adequately considering alternative options to maintain the districts, without considering how modern ranching practices and infrastructure actually detract from the character of and public access to the historic dairying districts, and without considering the fact that some ranches are not located within the historic districts;

    D.  Setting an arbitrary population level for the Drakes Beach herd of tule elk and electing to employ lethal control of tule elk based on a flawed analysis of how tule elk impact other park resources; and

    E.  Allowing livestock grazing that is detrimental to the primary purposes of the

Seashore, which are public benefit, inspiration, and recreation, and GGNRA, which are public use and enjoyment, that will cause adverse impacts to public health and safety, environmental or scenic values, and natural or cultural resources, and that will introduce and perpetuate non-native and invasive plants.

157.    For these reasons, NPS's ROD and GMPA are arbitrary, capricious, an abuse of discretion, and contrary to the Organic Act and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D). These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their supporters, members and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT

158.    Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 141, inclusive.

159.    This third claim for relief challenges NPS's ROD, GMPA, and EIS for failing to comply with NEPA. This claim for relief is brought under the APA, 5 U.S.C. §§ 701–706(2).

160.    NEPA's goals are to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," and to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(b)–(c).[5]

161.    To that end, NEPA requires federal agencies to prepare an EIS before taking action that "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332. An EIS must include, *inter alia*, a detailed statement of: (1) the environmental effects—including direct, indirect, and cumulative effects—of the proposed action; (2) any adverse effects that cannot be avoided if the proposed action is implemented; (3) reasonable alternatives to the

---

[5] Recent revisions to NEPA's regulations, 85 Fed. Reg. 43304, 43339 (July 16, 2020), do not apply because the EIS was prepared while the prior version of the regulations were in effect and cited those regulations. This complaint similarly cites the 1978 regulations that the EIS applied.

proposed action; and (4) mitigation measures to minimize any significant effects identified. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1502.14, 1502.16.

162.    Agencies must gather and disclose "high quality" information. 40 C.F.R. § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* The agency must disclose if information is incomplete or unavailable, and explain "the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts." *Id.* § 1502.22(b)(1).

163.    Through an EIS, an agency must take a "hard look" at the impacts of its proposed action and alternatives thereto in order to "foster both informed decision-making and informed public participation." *Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120, 1122 (9th Cir. 2010)

164.    In its EIS, NPS failed to take a hard look at the effects of allowing and expanding commercial beef and dairy ranching within the Seashore and GGNRA under the GMPA. The agency failed to do so in many ways, including but not limited to the following:

        A.    Failing to provide accurate and complete baseline information about, *inter alia*, existing ranch operations and residential uses, water quality and quantity, native plants and sensitive vegetation areas, other natural resources, tule elk and other wildlife, cultural and archaeological resources, and public health and safety risks;

        B.    Failing to fully analyze and disclose the direct, indirect, and cumulative impacts of the GMPA and ROD related to, *inter alia*, authorizing site-specific ranching operations on approximately 30 different public land allotments, deferring key decisions about individual ranch operations and mitigation measures until the lease/ROA process, allowing ranchers to propose new commercial activities like mobile slaughterhouses and dairy processing facilities, maintaining the Tomales Point elk fence under Alternatives A–E or removing the fence under Alternative F, killing tule elk within the Drakes Beach and Limnatour herds, failing to consider mitigation measures that address the transmission of Johne's disease from domesticated ungulates to tule elk, and proposing an undefined amount of targeted grazing throughout all subzones;

C.   Unreasonably assuming that management activities, mitigation measures and other plans—some of which have yet to be developed—and a new zoning framework will prevent or reduce adverse effects to the environment without analyzing and disclosing their potential effectiveness, feasibility, or full costs; and

D.   Failing to adequately respond to comments submitted by Plaintiffs, other agencies, and other members of the public.

165.   For these reasons, NPS's EIS, ROD, and GMPA are arbitrary, capricious, an abuse of discretion, and contrary to NEPA and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D). These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their supporters, members, and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE CLEAN WATER ACT**

166.   Plaintiffs hereby reallege and incorporate by reference paragraphs 1 through 141, inclusive.

167.   This fourth claim for relief challenges NPS's ROD and GMPA for violating section 313 of the Clean Water Act (CWA), 33 U.S.C § 1323(a). This claim for relief is brought under the APA, 5 U.S.C. §§ 701–706(2).

168.   Section 313 of the CWA requires all federal agencies with jurisdiction over property or engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants to comply with all state water quality standards. 33 U.S.C. § 1323(a).

169.   Applicable California state water quality standards, as established in the San Francisco Bay Basin Water Control Plan, establish beneficial uses and water quality objectives for concentrations of pathogens, nutrients, turbidity, and other pollutants in surface waters within groundwater and adjacent to the Seashore and GGNRA. Through the Basin Plan, the CAF Order, the Conditional Waiver and/or other requirements, the Water Board requires beef and dairy operations to comply with these standards.

COMPLAINT – Page 37

170.     Data and other evidence from NPS and other sources show that water quality standards have not been met in surface waters within and adjacent to Point Reyes National Seashore and GGNRA. On information and belief, beef and dairy ranches cause or contribute to these violations through discharges and/or runoff of manure, wastewater, sediment, stormwater, and other pollutants into surface water and/or groundwater. Ranching activities that generate pollutants or facilitate discharges and/or runoff include, but are not limited to, manure and wastewater collection, storage, and disposal; cattle grazing within or adjacent to surface waters; infrastructure that contributes pollutants to runoff; and cattle confinement and feeding in buildings and other structures at ranch complexes.

171.     The ROD and GMPA allow beef and dairy ranching and related activities to continue causing or contributing to violations of these water quality standards. These violations are likely to continue because the ROD and GMPA rely on undefined, ineffective, and/or incomplete mitigation measures, management activities, and plans to reduce water pollution. Moreover, the ROD and GMPA allow ranchers to expand their operations, which—according to the Water Board—risks increasing the discharge of pollutants above existing baseline levels and harming beneficial uses, which would violate the state's Anti-degradation Policy, State Water Resources Control Resolution No. 68-16.[6]

172.     Through the EIS and ROD, and supporting documents, NPS did not fully or accurately analyze the potential for ranching to cause or contribute to violations of water quality standards. NPS claimed that the GMPA and new leases/ROAs will result in improvements to water quality but did not analyze or claim that such improvements would bring ranching activities into compliance with water quality standards. Accordingly, NPS failed to ensure that beef and dairy ranching allowed through the ROD and GMPA will comply with all state water quality standards.

173.     To address water quality concerns, the ROD and the GMPA rely on the Water

---

[6] Resolution No. 68-16 requires the maintenance of the highest water quality achieved in California's waters since 1968 except where any reduction in such highest water quality would be consistent with the maximum benefit to the people of the State and would not result in any violation of an applicable water quality standard.

Quality Board's regulation of beef and dairy operations under the Conditional Waiver, CAF Order, and/or other state water quality requirements or regulations. But NPS did not consider or disclose whether beef and dairy ranches were in compliance with such requirements or regulations, despite its data showing ongoing violations of water quality standards, evidence that all dairies may not be covered by the CAF Order, and its own certifications that show all beef operations may not be fulfilling all requirements of the Conditional Waiver.

174. For these reasons, NPS's ROD and GMPA are arbitrary, capricious, an abuse of discretion, and contrary to the Clean Water Act and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D). These challenged actions have caused or threaten serious prejudice and injury to the rights and interests of Plaintiffs and their supporters, members, and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

A. Order, declare, and adjudge that NPS violated the Point Reyes Act, the Organic Act, the National Environmental Policy Act, the Clean Water Act, and/or the Administrative Procedure Act in adopting the Record of Decision, the General Management Plan Amendment, and the Final Environmental Impact Statement for Point Reyes National Seashore and the Northern District of Golden Gate National Recreation Area;

B. Set aside and vacate the Record of Decision, the General Management Plan Amendment, and the Final Environmental Impact Statement, and remand these matters to NPS;

C. Enter temporary, preliminary and/or permanent injunctive relief, as may be sought by Plaintiffs, including enjoining NPS from approving 20-year leases, new commercial activities, expanded ranching operations, and/or from undertaking new or expanded lethal tule elk control;

C. Enter such other declaratory relief and/or injunctive relief as hereafter prayed for by Plaintiffs;

D. Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et*

1

*seq.*, and all other applicable authorities; and/or

2

        E.      Grant such further relief as the Court deems necessary or appropriate to redress

3

NPS's legal violations and protect the Point Reyes National Seashore and GGNRA and the

4

natural resources and public lands within.

5

6

Dated: January 10, 2022               Respectfully submitted,

7

                                        */s/ Laurence ("Laird") J. Lucas*

8

                                        Laurence ("Laird") J. Lucas (CA Bar No. 124854)
llucas@advocateswest.org

9

                                        Elizabeth H. Potter (*pro hac vice* to be submitted)
epotter@advocateswest.org

10

                                        Andrew R. Missel (*pro hac vice* to be submitted)
amissel@advocateswest.org

11

                                        ADVOCATES FOR THE WEST
PO Box 1612

12

                                        Boise ID 83701
Telephone: (208) 342-7024

13

                                        Michael R. Lozeau (CA Bar No. 142893)

14

                                        michael@lozeaudrury.com
LOZEAU DRURY L.L.P.

15

                                        1939 Harrison St., Suite 150
Oakland CA 94612

16

                                        Telephone: (510) 836-4200

17

                                          *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28