TODD KIM
Assistant Attorney General
U.S. Department of Justice
SYDNEY A. MENEES (D.C. Bar # 1027544)
Trial Attorney
Environment and Natural Resources Division
150 M Street, NE
Washington, D.C. 20002
(202) 514-2398
sydney.menees@usdoj.gov
DAVID L. NEGRI (Idaho Bar # 6697)
Trial Attorney
Environment and Natural Resources Division
c/o U.S. Attorney's Office
1290 West Myrtle Street, Suite 500
Boise, Idaho 83702
(208) 334-1936
david.negri@usdoj.gov

STEPHANIE M. HINDS (Cal. Bar # 154284)
United States Attorney
MICHELLE LO (New York Bar # 4325163)
Chief, Civil Division
MICHAEL T. PYLE (Cal. Bar # 172954)
Assistant United States Attorney
150 Almaden Boulevard, Suite 900
San Jose, California 95113
Telephone: (408) 535-5087

Attorneys for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE, CENTER FOR BIOLOGICAL DIVERSITY, and WESTERN WATERSHEDS PROJECT,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL PARK SERVICE, a federal agency,<br><br>Defendant. | Case No. 4:22-cv-00145-KAW<br><br>**DEFENDANT'S ANSWER** |

Pursuant to Federal Rule of Civil Procedure 8, the National Park Service ("NPS") hereby answers, alleges, and asserts defenses to the allegations in the Complaint (ECF No. 1) filed on January 10, 2022, by Resource Renewal Institute, Center for Biological Diversity, and Western Watersheds Project (collectively, "Plaintiffs") and responds to each numbered paragraph therein as follows.

## RESPONSES TO COMPLAINT ALLEGATIONS[1]

The headings and paragraph numbers below correspond to the headings and paragraph numbers in Plaintiffs' Complaint. The NPS denies any allegations in the Complaint, whether express or implied, that are not expressly admitted, denied, or qualified herein.

## **INTRODUCTION**

1.      The first sentence in paragraph 1 contains Plaintiffs' characterization of the purposes of this case to which no response is required. The NPS denies the allegations in the second sentence.

2.      The NPS admits that during the 1970s and 1980s, private ranch lands in Point Reyes National Seashore were purchased by the United States and that the selectively quoted language appears in 16 U.S.C. § 459c and § 460bb. The NPS denies the allegations in the second sentence. The NPS admits that the selectively quoted language appears in 16 U.S.C. § 459c-6(a). The NPS denies any remaining allegations in this paragraph.

3.      The NPS denies the allegations in this paragraph.

4.      The NPS admits that Plaintiffs, other groups, and individual members of the public submitted comments during the National Environmental Policy Act ("NEPA") scoping and public comment period on the General Management Plan Amendment Environmental Impact Statement ("GMPA/EIS") and that some comments expressed concerns about the impacts of ranching. The NPS also admits that it issued a Record of Decision ("ROD") on the GMPA/EIS in September, 2021. The NPS denies the remaining allegations in this paragraph.

5.      The NPS denies the allegations in paragraph 5.

6.      The NPS denies the allegations in paragraph 6.

---

[1] The numbered paragraphs of this Answer correspond to the numbered paragraphs of the Complaint. The NPS does not waive any defensive theory or agree to or admit that Plaintiffs' headings are accurate, appropriate, or substantiated. When a textual sentence is followed by a citation or citations, the textual sentence and its accompanying citation are referred to as one sentence.

7.     The NPS denies the allegations in the first sentence. The allegations in the second sentence address the relief that Plaintiffs seek from the Court, to which no response is required. To the extent that a further response is required, the NPS denies that Plaintiffs are entitled to any relief in this case.

## JURISDICTION

8.     The allegations in this paragraph consist of conclusions of law to which no response is required. To the extent a response is required the NPS denies those allegations.

9.     The allegations in this paragraph consist of conclusions of law to which no response is required. To the extent a response is required the NPS denies those allegations.

10.     The allegations in this paragraph consist of conclusions of law to which no response is required. To the extent a response is required the NPS denies those allegations.

## DIVISIONAL ASSIGNMENT

11.     As to the first sentence, the NPS admits that if this Court has jurisdiction then venue is proper in this district. The NPS admits that if this Court has jurisdiction then the assignment of this case to a judge in the San Francisco or Oakland Division is proper. The NPS denies any remaining allegations in paragraph 11.

## PARTIES

12.     The NPS is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 12 and therefore denies the same.

13.     The NPS is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 and therefore denies the same.

14.     The NPS is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 and therefore denies the same.

15.     The NPS is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 and therefore denies the same.

16.     The NPS is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 and therefore denies the same.

17.     The NPS is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 and therefore denies the same. Further, paragraph 17 contains legal

conclusions to which no response is required. To the extent a response is required, those allegations are denied.

18.      The NPS admits that Plaintiffs submitted comments during the NEPA planning process for the GMPA/EIS. The NPS admits that Plaintiffs submitted letters and other information but not necessarily during the official public comment periods during the GMPA planning process. The remaining allegations in this paragraph consist of legal conclusions to which no response is required. To the extent a response is required, those allegations are denied.

19.      The NPS admits that the National Park Service is an agency within the U.S. Department of the Interior and that the Director of the National Park Service is vested with authority to manage units of the National Park System. The NPS denies any remaining allegations in paragraph 19.

**LEGAL BACKGROUND**

**National Park Service Organic Act**

20.      The allegations of this paragraph purport to quote and characterize 54 U.S.C. § 100101(a). The NPS admits that 54 U.S.C. § 100101(a) contains the quoted language, without any emphasis or italicized text, and otherwise denies the allegations in paragraph 20.

21.      The allegations in this paragraph purport to quote and characterize the 2006 NPS *Management Policies*. The NPS admits that the 2006 NPS *Management Policies* contains the quoted language, but otherwise denies the allegations in paragraph 26.

22.      The allegations in this paragraph purport to quote and characterize the 2006 NPS *Management Policies*. The NPS admits that the 2006 NPS *Management Policies* contains the quoted language, but otherwise denies the allegations in this paragraph.

23.      The allegations in the first sentence purport to quote and characterize 54 U.S.C. § 100502 (Pub. L. 95-625 § 604(3)). As to the first sentence, the NPS admits that Congress enacted legislation in 1978 requiring the National Park Service to prepare and revise general management plans (GMPs) for the preservation and use of each unit of the national park system. The NPS admits that the quoted language appears in 54 U.S.C. § 100502 but otherwise denies the allegations of the second sentence.

**Point Reyes National Seashore Act**

24.      The NPS admits that Congress enacted legislation in 1962 to establish the Seashore and that

the text selectively quoted in paragraph 24 is codified at 16 U.S.C. § 459c. The NPS denies any remaining allegations in paragraph 24.

25.     As to the first sentence, the NPS admits that the Point Reyes National Seashore's enabling legislation authorizes the Secretary of the Interior to acquire lands, waters and other property interests within the legislative boundary for the Seashore. In the second sentence, Section 4 of the enabling act speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the statute, they are denied. As to the third sentence, the NPS admits that Congress amended the Seashore's enabling legislation in 1970 to repeal the condemnation restriction but denies the remaining allegations in this sentence.

26.     The allegations in this paragraph purport to characterize 16 U.S.C. § 459c-6(a) as it existed in 1970. The NPS admits that in 1970, Section 459c-6(a) referenced the NPS Organic Act and "laws of general application relating to the national park system as defined by sections 1b to 1d of this title." The NPS denies the remaining allegations in this paragraph.

27.     As to the first sentence, the NPS admits that Congress amended the Seashore's enabling legislation in 1976 and denies the remaining allegations in this sentence. The second sentence purports to quote and characterize the 1976 amendment. The 1976 amendment speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the amendment, they are denied. The NPS denies the allegations in the third sentence.

28.     As to the first sentence in paragraph 28, the NPS admits that in 1978 Congress amended the provision of the 1962 Act regarding reservations of use and occupancy. The 1978 Act speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the 1978 Act, they are denied. With respect to the second and third sentences, 16 U.S.C. § 459c-5(a) speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the statutory language, they are denied. The NPS denies any remaining allegations in paragraph 28.

**The GGNRA Act**

29.     The NPS admits that Congress enacted legislation in 1972 to establish the Golden Gate National Recreation Area ("GGNRA") Act; that legislation speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the legislation, they are denied. The

NPS denies any remaining allegations in paragraph 29.

30.     The allegations in this paragraph quote 16 U.S.C. § 460bb, which speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the statute, they are denied.

31.     Paragraph 31 purports to characterize the GGNRA Act and the Point Reyes Act. The NPS admits that Congress amended the GGNRA Act and Point Reyes Act in 1978; the legislation speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the legislation, they are denied.

**FACTUAL BACKGROUND**

32.     The NPS admits the allegations in the first sentence, except parts of the coastline are developed and the Seashore only includes tide and submerged lands to ¼ mile offshore along the Pacific Coast and in part of Tomales Bay. The NPS admits the allegations in the second sentence and third sentences but avers that there are over 100 miles of trails in the Seashore, but all these trails are not in wilderness. The NPS admits that the Seashore is the only National Seashore on the West Coast and that it contains diverse natural resources. The NPS denies the remaining allegations in this paragraph.

33.     The NPS admits that the Point Reyes area has a rich cultural heritage and that the Coast Miwok people have been culturally affiliated with the Point Reyes area for thousands of years. The NPS denies the remaining allegations in the first sentence. The NPS admits the allegations in the second sentence.

34.     The NPS admits that the United States purchased ranch properties in the Seashore in the 1970s. The NPS denies the allegations in the second sentence. The NPS admits that the Superintendent of the Seashore manages the north district of GGNRA and avers that the area is properly referred to as the north district of GGNRA, not the northern district. The NPS denies the remaining allegations in this paragraph. The NPS denies any remaining allegations in paragraph 34.

35.     As to the first sentence, the NPS admits that in 1980, the NPS issued a General Management Plan ("1980 GMP") for the Seashore and for all of GGRNA, not just the north district. The allegations in the second, third and fourth sentences purport to quote and characterize the 1980 GMP, which speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent

with the GMP, they are denied. The NPS denies any remaining allegations in this paragraph.

36.     The NPS admits the preferred alternative in the GMPA/FEIS identified 24 ranch operations on approximately 18,000 acres in the Seashore and 10,000 acres in the north district of GGNRA and that all allotments in GGNRA are for beef. The NPS denies that six dairy operations are authorized under the GMPA/EIS Record of Decision. The NPS denies any remaining allegations in this paragraph.

37.     The NPS admits that it previously authorized a chicken operation on one ranch. The NPS denies the remaining allegations in this paragraph.

38.     The NPS admits that the map accompanying Paragraph 38 depicts the location of 31 ranch allotments and two life-estates in the Seashore and the north district of GGNRA and that these allotments are located on approximately 28,000 acres of land managed by NPS. The NPS denies the remaining allegations in this paragraph.

39.     The NPS admits that recent annual visitation to the Seashore is more than 2,000,000 people annually and that visitors come to the Seashore to engage in a wide variety of activities including enjoying park resources, viewing wildlife and engaging in recreational and educational activities. The NPS admits that spending by visitors to the Seashore in gateway communities totaled more than $100 million between 2015 and 2018. The NPS denies the remaining allegations in this paragraph.

40.      The NPS admits the allegations in paragraph 40, except that NPS denies that Bolinas lagoon and bay are part of the Seashore.

41.     The NPS admits the allegations in paragraph 41, except that NPS denies that the Seashore provides habitat for 50 species listed under the Endangered Species Act.

42.     The NPS admits that the Seashore is the only unit of the National Park System where visitors can observe tule elk, and that tule elk were extirpated from the Seashore by the 1860s. The NPS denies the remaining allegations in the first sentence. The NPS denies the allegations in the second sentence. As to the third sentence, the NPS admits that Public Law No. 94-389 contains the selectively quoted language in a "Whereas" clause. The NPS admits the allegations in the fourth sentence.

43.     The NPS admits that there are three herds of tule elk in the Seashore that are known as the Drakes Beach herd, the Limantour herd and the Tomales Point herd; and that the Tomales Point herd is confined to an approximately 2,900 acre elk reserve on Tomales Point that is bounded by an eight-

foot high fence that is approximately 2.5 miles long. The NPS denies the remaining allegations in this paragraph.

44.     The NPS admits that the north district of GGNRA is approximately 15,000 acres. The NPS admits that Lagunitas Creek and Olema Creek drain to Tomales Bay. The NPS denies the remaining allegations in this paragraph.

45.     The NPS denies the allegations in paragraph 45.

46.     The NPS admits that 5,725 cattle are currently authorized to graze park lands. The NPS denies the remaining allegations in paragraph 46.

47.     The NPS denies the allegations in paragraph 47.

48.     The NPS denies the allegations in the first sentence. The NPS admits the allegations in the second sentence. With respect to the third sentence, the March 18, 2021 Biological Opinion issued by the National Marine Fisheries Service speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the March 18, 2021 Biological Opinion, they are denied. The NPS denies the allegations in the fourth sentence.

49.     The NPS denies the allegations in the first sentence. The NPS admits that some ranchers have been authorized in the past to seed grasses for forage on up to 1,000 acres (referred to as Forage Production in the GMPA/EIS) and to mow these fields to harvest forage. The NPS admits that ravens are present in the Seashore and GGNRA and that ravens prey on snowy plover eggs and chicks. The NPS denies any remaining allegations in this paragraph.

50.     The NPS denies the allegations in the first, second and third sentences of paragraph 50. The NPS admits that cattle occasionally have gotten out of fenced pastures and been found near Abbott's Lagoon. The NPS denies the remaining allegations in the fourth sentence.

51.     The NPS admits that ranchers use barbed wire, electric fencing and off-road vehicles but denies the remaining allegations in paragraph 51.

52.     The NPS denies the allegations in the first and second sentences of paragraph 52. As to the third sentence, the NPS admits that dairies generally have higher densities of cows than beef ranches but denies the remaining allegations in the third sentence.

53.     The NPS denies the allegations in the first sentence. The NPS admits that residences on

ranches use septic systems, that some ranch residences use springs or wells, and that others obtain water from NPS or a local utility. The NPS denies any remaining allegations in paragraph 53.

54.     The NPS denies the allegations in the first and fifth sentences. The NPS admits that trucks visit dairies to collect milk, that tanker trucks are used to spread manure on certain fields occasionally, and that trucks bring hay to ranches occasionally. The NPS denies any remaining allegations in this paragraph.

55.     The NPS denies the allegations in paragraph 55.

56.     The NPS denies the allegations in the first sentence. The NPS admits that it has received communications from members of the public regarding alleged violations of ranch leases including debris, trash, bulldozing, unauthorized livestock and cow carcasses. The NPS denies the remaining allegations in this paragraph.

57.     The NPS denies the allegations in paragraph 57.

58.     As to the first sentence, the NPS admits that on February 3, 2000, it published a notice of intent in the Federal Register to prepare an environmental impact statement and General Management Plan for the Seashore, including the north district of GGNRA (65 Fed. Reg. 5365), but denies the remaining allegations in this sentence. The NPS denies the allegations in the second sentence.

59.     The NPS admits that it initiated a NEPA planning process for a Ranch Comprehensive Management Plan in 2014. The NPS denies the remaining allegations in this paragraph.

60.     The allegations in the first sentence purport to characterize the complaint filed in *RRI v. NPS*, 3:16-cv-00688-SBA. The NPS admits that the First Amended Complaint in *RRI v. NPS* challenged the alleged failure of the NPS to timely revise the GMP for the Seashore and the NPS's alleged failure to authorize ranching without sufficient NEPA compliance. The NPS admits the allegations in the second and third sentences.

61.     The NPS admits the allegations in paragraph 61, but avers that the correct name is the Point Reyes Peninsula Dairy Ranches Historic District.

62.     The NPS admits that the Point Reyes Peninsula Dairy Ranches Historic District is comprised of 17 ranch areas, but denies the remaining allegations in the first sentence. The NPS admits the allegations in the second and third sentences.

63.    The NPS admits the allegations in paragraph 63.

64.    The NPS admits that among the reasons the two districts are historically significant is because of their association with the history of dairy ranching in Marin County and because they contain buildings and structures that reflect that history.

65.    The NPS admits that the National Register nomination forms for both districts state that, "[M]ost of the dairies on the peninsula milked between 100 and 250 cows and were considered small in relation to those that milked three or four times as many." The NPS denies the remaining allegations in this paragraph.

66.    As to the first and second sentences, the NPS admits that the National Register nomination forms for both districts state that, "[T]he death knell for most of the remaining dairies in the historic district appears to have been caused by California's strict water quality laws. Enacted in the 1970s, provisions to protect water quality required large capital outlays for manure handling." The NPS admits that structures and improvements constructed after the period of significance are not listed as contributing resources of the historic districts. The NPS denies any remaining allegations in this paragraph.

67.    The NPS admits the allegations in this paragraph and avers that in October, 2017 the NPS issued a newsletter seeking public input on a conceptual range of alternatives for the GMPA/EIS.

68.    The NPS admits the allegations in the first and second sentences. The NPS admits the allegations in the third sentence and avers that the GMPA/EIS also included desired conditions for cultural resources.

69.    As to the first sentence, the NPS admits that the No Action alternative in the GMPA/EIS was Alternative A, but denies the remaining allegations in the first sentence. The NPS admits the allegations in the second sentence. As to the third sentence, the NPS admits that 7,600 acres of land used for ranching was not included in the Special Use-Pastoral Lands or Pastoral Landscape Management zones in the 1980 GMP and avers that all 7,600 acres were used for grazing at the time of the 1980 GMP and that of this 7,600 acres, approximately 1,800 acres were still privately-owned at the time of the 1980 GMP. The NPS denies any remaining allegations in the third sentence.

70.    As to the first sentence, the NPS admits that Alternative B from the GMPA/EIS was the NPS's

preferred alternative; that this alternative was identified as the proposed action during the scoping process for the GMPA/EIS; and that, consistent with longstanding land use patterns, Alternative B proposed to include 7,600 acres of land used for ranching (but that had been previously zoned as part of the Natural Environment, Special Use, Deferred Acquisition or Natural Landscape Management zones) in the GMPA's Ranchland zone. As to the second sentence and third sentences, the NPS admits that Alternative B in the GMPA/FEIS allotted approximately 16,900 acres to the Range subzone, 9,000 acres to the Pasture subzone, 220 acres to the Ranch Core subzone (which zone would only apply to the 18 residentially-occupied ranches), 2,000 acres to the Resource Protection subzone and 600 acres to the Scenic Landscape Zone. The NPS denies the remaining allegations in this paragraph.

71.     The NPS denies the allegations in paragraph 71.

72.     The NPS admits that Alternative C in the GMPA/FEIS was the same as the version of Alternative B in the GMPA/FEIS, except that under Alternative C, the entire Drakes Beach herd of tule elk would be removed.

73.     The allegations in the first sentence purport to characterize the 2017 Settlement Agreement in *RRI v. NPS*, Case No. 3:16-cv-00688-SBA. The Settlement Agreement speaks for itself and is the best evidence of its contents and the NPS denies the allegations to the extent they are not consistent with the Settlement Agreement. Sentences two through four characterize the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS. The NPS denies any remaining allegations in this paragraph.

74.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

75.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

76.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

77.     The NPS admits the allegations in the first sentence. In the second sentence, NPS lacks sufficient information to form a belief as to the truth or falsity of the allegations because the calculations were provided by Plaintiffs, and therefore denies the allegations.

78.     The NPS admits that each of the three named plaintiffs submitted comments during the public comment period on the GMPA/EIS, but the NPS is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the first sentence and therefore denies those allegations. The allegations in the second sentence characterize comment letters submitted by the three named plaintiffs. The comment letters speak for themselves and are the best evidence of their contents and the allegations are denied to the extent they are inconsistent with the letters.

79.     The NPS admits that it received comments on the GMPA/EIS from federal and state agencies. The allegations in the remainder of the paragraph characterize comment letters from the U.S. Environmental Protection Agency and the San Francisco Regional Water Quality Control Board ("RWQCB"). These comments speak for themselves and are the best evidence of their contents. To the extent the allegations are inconsistent with the comments, they are denied.

80.     The NPS denies the allegations in the first sentence of paragraph 80. The remaining allegations characterize the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

81.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

82.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

83.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

84.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

85.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

86.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

87.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

88.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

89.     The allegations in the first sentence characterize the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS. The NPS admits that it has not completed an appraisal process for issuing leases under the GMPA. The NPS denies the remaining allegations in this paragraph.

90.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

91.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

92.     The NPS denies the allegations in paragraph 92 except to admit that the GMPA/FEIS disclosed that the preferred alternative would reduce water quality pollution.

93.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

94.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

95.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

96.     This paragraph characterizes the EIS, which speaks for itself and is the best evidence of its contents, and the NPS denies the allegations to the extent they are inconsistent with the EIS.

97.     The NPS is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 97 and therefore denies the same.

98.     The NPS denies the allegations in paragraph 98.

99.     The allegations in this paragraph purport to summarize the contents of the Water Quality Control Plan for the San Francisco Basin ("Basin Plan"). This Plan speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the Plan, they are denied. The NPS denies any remaining allegations in this paragraph.

100.    The NPS admits the allegations in the first sentence. The NPS admits that the RWQC issued

the Conditional Waiver in 2018, but the NPS is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in the second sentence and therefore denies those allegations. The allegations in the third sentence characterize a Conditional Waiver, which speaks for itself and is the best evidence of its contents and the NPS denies the allegations to the extent they are inconsistent with the Conditional Waiver.

101.    The NPS admits that it submitted annual certifications to the RWQCB for beef ranches that drain to the Tomales Bay watershed and that the annual certifications identify inspections that were conducted on these beef ranch, but the NPS denies any remaining allegations in the first sentence. The allegations in the second sentence characterize the annual certifications, which speak for themselves and are the best evidence of their contents and the NPS denies the allegations to the extent they are inconsistent with the certifications. Any remaining allegations are conclusions of law to which no response is required; to the extent a response is required those allegations are denied.

102.    The allegations in this paragraph characterize and Order of the Water Board, which speaks for itself and is the best evidence of its contents. The NPS denies the allegations to the extent they are inconsistent with the Order.

103.    The allegation as to which dairies were covered under a Conditional Waiver is a conclusion of law to which no response is required; to the extent a response is required the allegation is denied. The NPS denies the remaining allegations in the first sentence. The remaining allegations in paragraph 103 characterize notices of intent alleged to have been submitted by dairies. Those notices of intent speak for themselves and are the best evidence of their contents and the NPS denies the allegations to the extent they are inconsistent with the notices of intent.

104.    The NPS admits that it submitted a Consistency Determination to the California Coastal Commission ("CCC") on October 16, 2020. That Consistency Determination speaks for itself and is the best evidence of its contents and the NPS denies the allegations to the extent they are inconsistent with the Consistency Determination. The remaining allegations in this paragraph consist of conclusions of law to which no response is required; to the extent a response is required those allegations are denied.

105.    The allegations in this paragraph purport to characterize the Staff Report issued by the CCC on

March 26, 2021. The Report speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the Report, they are denied.

106.     The NPS admits that on April 22, 20121, the CCC conditionally concurred with the NPS's Consistency Determination but avers that the CCC received approximately 35,000 comments on the CD. The remainder of the allegations in the first sentence characterize the substance of the comments, which speak for themselves and are the best evidence of their contents; to the extent the allegations are inconsistent with the comments they are denied. The allegations in the second sentence characterize the CCC's concurrence, which speaks for itself and is the best evidence of its contents; the NPS denies the allegations to the extent they are inconsistent with the CCC's concurrence.

107.     The NPS is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence and therefore denies the same. The NPS admits that the quotations in the second and third sentences are included in a document prepared for Western Watershed Project. The NPS denies any remaining allegations in this paragraph.

108.     The NPS admits that the Executive Officer of the San Francisco Bay Regional Water Quality Control Board issued a report on April 7, 2021 and that the quoted language appears in the Executive Officer's report. The NPS denies any remaining allegations in this paragraph.

109.     The NPS denies the allegations in paragraph 109.

110.     The NPS admits the allegations in the first sentence but avers that the emergency water use application was prepared in spring 2021, not fall 2020. The NPS admits that it allowed the lessees of J Ranch to pump water from Kehoe Creek at various times during the drought from 2013-2015.

111.     The NPS admits that Marin County declared a county-wide drought emergency on May 18, 2021, and that the Marin Municipal Water District reported that the 20-month period between January 1, 2020 and August 1, 2021 had the lowest recorded rainfall for a 20-month period in 140 years. The NPS denies any remaining allegations in this paragraph.

112.     The NPS admits that in spring 2021 that Robert McClure notified the NPS that he was closing his dairy operation at I Ranch. The NPS admits the allegations in the second sentence. As to the third sentence, the NPS admits that Mr. McClure continues to raise heifers on I Ranch under his current lease. The NPS denies any remaining allegations in paragraph 112.

113.    The NPS admits that several ranchers at the Seashore trucked water to their ranches in 2021. The NPS denies the remaining allegations in this paragraph.

114.    The NPS admits that the National Marine Fisheries Service ("NMFS") issued a Biological Opinion ("BiOp") on March 18, 2021. The NMFS BiOp speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the NMFS BiOp, they are denied. The NPS denies any remaining allegations in this paragraph.

115.    The NPS admits that the U.S. Fish and Wildlife Service ("FWS") issued a Biological Opinion (BiOp) on June 4, 2021. The FWS BiOp speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the FWS BiOp, they are denied. The NPS denies any remaining allegations in this paragraph.

116.    The NPS admits that the Acting Regional Director, Interior Regions 8, 9, 10 and 12, signed the Record of Decision (ROD) for the GMPA/EIS on September 13, 2021. The remaining allegations characterize the contents of the ROD, which speaks for itself and is the best evidence of its contents. To the extent those allegations are inconsistent with the ROD they are denied. The NPS denies any remaining allegations in this paragraph.

117.    The NPS admits that the Superintendent of the Seashore signed a document entitled, *Succession Policy for Ranch Operations within the Ranchland Zone for Point Reyes National Seashore and the North District of Golden Gate National Recreation Area*, on September 13, 2021. The NPS denies any remaining allegations in this paragraph.

118.    The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies the remaining allegations in paragraph 118. The NPS denies the allegations in the third sentence.

119.    The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied.

120.    The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD,

they are denied.

121.     The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied.

122.     The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied.

123.     Because the allegations in the first and second sentences of paragraph 123 are vague and generalized, the NPS is without sufficient knowledge or information to form a belief as to the truth of the allegations and therefore denies the same. The NPS denies the allegations in the third sentence.

124.     The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies any remaining allegations in paragraph 124.

125.     The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies the remaining allegations in paragraph 125.

126.     The allegations in the first sentence characterize an EIS, which speaks for itself and is the best evidence of its contents. The allegations are denied to the extent they are inconsistent with the EIS. The remaining allegations in this paragraph are denied.

127.     The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies any remaining allegations in paragraph 127.

128.     The NPS denies the allegations in paragraph 128.

129.     The allegations in this paragraph purport to characterize the ROD and the EIS. The ROD and the EIS speaks for themselves and are the best evidence of their contents. To the extent the allegations are inconsistent with the ROD and EIS, they are denied. The NPS denies the remaining allegations in paragraph 129.

130.     The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself

and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies the remaining allegations in paragraph 130.

131.    The NPS admits that it prepared a non-impairment determination that analyzed whether the selected action would impair park resources subject to the non-impairment standard. That determination speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the determination, they are denied. The NPS denies the remaining allegations in this paragraph.

132.    The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies the remaining allegations in paragraph 132.

133.    The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies the remaining allegations in paragraph 133.

134.    The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies the remaining allegations in paragraph 134.

135.    The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies the remaining allegations in paragraph 135.

136.    The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies the remaining allegations in paragraph 136.

137.    The allegations in this paragraph purport to characterize the ROD. The ROD speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied. The NPS denies the remaining allegations in paragraph 137.

138.    The NPS admits the allegations in the first sentence. As to the second sentence, the NPS admits that it is expending time and resources toward the development of leases under the GMPA. However, the NPS denies that it will issue 20-year leases prior to the expiration of the current interim leases. The

NPS avers that it plans to issue short-term (one or two-year) lease extensions prior to the expiration of the interim leases.

139.     The NPS admits that prior to issuing leases under the GMPA, the NPS will develop an initial ROA with the lessees of each ranch allotment, but the NPS denies that the initial ROA for each ranch will include all of the enumerated items listed in the first sentence. As to the second sentence, the NPS admits that it will obtain appraisals to assist in determining rental rates for leases issued under the GMPA. The NPS denies any remaining allegations in this paragraph.

140.     The NPS admits that the FEIS found that issuance of long-term leases could allow ranchers to more easily obtain loans to upgrade ranch infrastructure and provide for business security, but the NPS denies the remaining allegations in the first sentence. The NPS is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of this paragraph and therefore denies the same.

141.     The NPS admits that lethal reduction of the Drakes Beach herd to 140 animals is authorized under the ROD, but the NPS denies that at this time it has plans to lethally reduce the population of the Drakes Beach herd. The NPS denies any remaining allegations in this paragraph.

**FIRST CLAIM FOR RELIEF**

142.     The NPS incorporates by reference its responses to paragraphs 1-141 as though fully set forth herein.

143.     The allegations in paragraph 143 purport to characterize Plaintiffs' First Claim for Relief and the NPS denies those allegations.

144.     The NPS admits that the quoted language in the first, second and third sentences of this paragraph appears in 16 U.S.C. § 459c, 459c-6(a) and 459c-5(a) (but without any italics). The NPS denies any remaining allegations in this paragraph.

145.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

146.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

147.     This paragraph contains legal conclusions to which no response is required. To the extent a

1   response is required, the allegations are denied.

2   148.   This paragraph attempts to characterize the ROD. The ROD speaks for itself and is the best

3   evidence of its contents. To the extent the allegations are inconsistent with the ROD, they are denied.

4   Additionally, this paragraph contains legal conclusions to which no response is required. To the extent

5   a response is required, the allegations are denied.

6   149.   This paragraph contains legal conclusions to which no response is required. To the extent a

7   response is required, the allegations are denied.

8   **SECOND CLAIM FOR RELIEF**

9   150.   The NPS incorporates by reference its responses to paragraphs 1-141 as though fully set forth

10   herein.

11   151.   The allegations in paragraph 151 purport to characterize Plaintiffs' Second Claim for Relief.

12   These are legal conclusions to which no response is required. To the extent a response is required, the

13   allegations are denied.

14   152.   The allegations of this paragraph purport to quote and characterize 54 U.S.C. § 100101(a) and

15   the 2006 NPS Management Policies. 4 U.S.C. § 100101(a) and the 2006 NPS Management Policies

16   speak for themselves and are the best evidence of their contents. To the extent the allegations are

17   inconsistent with 4 U.S.C. § 100101(a) and the 2006 NPS Management Policies, they are denied.

18   153.   The allegations of the first sentence purport to quote and characterize 54 U.S.C. § 102101. 54

19   U.S.C. § 102101 speaks for itself and is the best evidence of its contents. To the extent the allegations

20   are inconsistent with the 54 U.S.C. § 102101, they are denied. The allegations of the second sentence

21   purport to quote and characterize the 2006 NPS Management Policies. The 2006 NPS Management

22   Policies speak for themselves and are the best evidence of their contents. To the extent the allegations

23   are inconsistent with the 2006 NPS Management Policies, they are denied. Additionally, this

24   paragraph contains legal conclusions to which no response is required. To the extent a response is

25   required, the allegations are denied.

26   154.   The allegations in this paragraph purport to quote and characterize the Organic Act. The

27   Organic Act speaks for itself and is the best evidence of its contents. To the extent the allegations are

28   inconsistent with the Organic Act, they are denied.

155.    The allegations in this paragraph purport to quote and characterize NPS regulations. The NPS Regulations speaks for themselves and are the best evidence of their contents. To the extent the allegations are inconsistent with the NPS Regulations, they are denied.

156.    This paragraph, including subparagraphs A – E, contains legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

157.    This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

**THIRD CLAIM FOR RELIEF**

158.    The NPS incorporates by reference its responses to paragraphs 1-141 as though fully set forth herein.

159.    The allegations in paragraph 159 purport to characterize Plaintiffs' Third Claim for Relief. These are legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

160.    The allegations in this paragraph purport to quote and characterize NEPA. NEPA speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with NEPA, they are denied. Footnote 5 is a legal conclusion to which no response is required.

161.    The allegations in paragraph 161 purport to quote and characterize the requirements of NEPA and its implementing regulations. NEPA and its implementing regulations speak for themselves and are the best evidence of their contents. To the extent the allegations are inconsistent with NEPA and its implementing regulations, they are denied. The NPS denies any remaining allegations in this paragraph.

162.    The allegations in paragraph 162 purport to quote and characterize sections of the 1978 CEQ NEPA regulations. The 1978 CEQ NEPA regulations speak for themselves and are the best evidence of their contents. To the extent the allegations are inconsistent with the 1978 CEQ NEPA regulations, they are denied.

163.    The allegations in paragraph 163 purport to quote and characterize *Oregon Natural Desert Ass'n. v. Bureau of Land Management*, 625 F.3d 1092, 1120 (9th Cir. 2010). That decision speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the

decision, they are denied.

164.     This paragraph, including subparagraphs A – D, contains legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

165.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

## **FOURTH CLAIM FOR RELIEF**

166.     The NPS incorporates by reference its responses to paragraphs 1-141 as though fully set forth herein.

167.     The allegations in paragraph 167 purport to characterize Plaintiffs' Fourth Claim for Relief, which are legal conclusions to which no response is required.

168.     Paragraph 168 purports to quote and characterize the CWA. The CWA speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the CWA, they are denied.

169.     The allegations in this paragraph purport to summarize the requirements of the Basin Plan, the CAF Order, the Conditional Waiver and other unnamed requirements. These documents speak for themselves and are the best evidence of their contents. To the extent the allegations are inconsistent with these documents, they are denied.

170.     Because the allegations in the first and third sentences of paragraph 170 are vague and generalized, the NPS is without sufficient knowledge or information to form a belief as to the truth of these allegations and therefore denies the same. The NPS denies the allegations in the second sentence.

171.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the allegations are denied. Footnote 6 purports to characterize Resolution No. 68-16. Resolution No. 68-16 speaks for itself and is the best evidence of its contents. To the extent the allegations are inconsistent with the Resolution No. 68-16, they are denied.

172.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

173.     This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

174.    This paragraph contains legal conclusions to which no response is required. To the extent a response is required, the allegations are denied.

## REQUEST FOR RELIEF

The remaining paragraphs of the Plaintiffs' Complaint constitute Plaintiffs' prayer for relief, to which no response is required. To the extent that a further response is required, the NPS denies the allegations in Plaintiffs' prayer for relief and denies that Plaintiffs are entitled to any relief in this case.

## GENERAL DENIAL

All allegations in the Complaint not specifically admitted are denied.

## DEFENSES

In further answer to Plaintiffs' Complaint and as separate defenses, the NPS states as follows:

## FIRST DEFENSE

The Court lacks jurisdiction over Plaintiffs' claim unless Plaintiffs can meet their burden to establish Article III standing.

## SECOND DEFENSE

The Complaint should be dismissed to the extent that the Court lacks subject matter jurisdiction over any aspect of the Complaint.

## THIRD DEFENSE

The Complaint should be dismissed to the extent that it fails to state a claim for relief.

## FOURTH DEFENSE

Plaintiffs' claims are barred to the extent Plaintiffs failed to exhaust administrative remedies prior to filing suit.

## FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they are not ripe for adjudication.

## SIXTH DEFENSE

The NPS has insufficient knowledge or information at this time upon which to form a belief as to whether there are additional but as yet unstated defenses available. The NPS reserves the right to assert additional defenses in the event developments indicate it would be appropriate to do so.

1

2

3    Dated this 21st day of March, 2022.

4                                    TODD KIM
                                     United States Department of Justice
5                                    Assistant Attorney General

6

7                                    */s/ Sydney A. Menees*
                                     SYDNEY A. MENEES, Trial Attorney
8                                    DAVID L. NEGRI, Trial Attorney
                                     United States Department of Justice
9                                    Environment and Natural Resources Division

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S ANSWER
Case No. 4:22-cv-00145-KAW