Tony Francois, Cal. Bar #184100
BRISCOE IVESTER & BAZEL LLP
235 Montgomery Street, Suite 935
San Francisco, California, 94104
Telephone:      (415) 402-2700
Facsimile:      (415) 398-5630
Email:          tfrancois@briscoelaw.net

Caroline Lobdell, Ore. Bar #021236, *pro hac vice forthcoming*
Aaron Bruner, Ore. Bar #133113, *pro hac vice forthcoming*
WESTERN RESOURCES LEGAL CENTER
9220 SW Barbur Blvd., Suite 119 #327
Portland, Oregon 97219
Telephone:      (503) 768-8500
Facsimile:      (503) 222-3255
Email:          clobdell@wrlegal.org
                abruner@wrlegal.org

Attorneys for Proposed Defendant-Intervenor
POINT REYES SEASHORE RANCHERS ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE; CENTER FOR BIOLOGICAL DIVERSITY; and WESTERN WATERSHEDS PROJECT, | Case Number: 4:22-cv-00145-KAW |
| Plaintiffs, | **DECLARATION OF ERNEST SPALETTA** |
| v. | |
| NATIONAL PARK SERVICE, a federal agency, | |
| Defendant, | |
| POINT REYES SEASHORE RANCHERS ASSOCIATION, | |
| Proposed Defendant-Intervenor. | |

DECLARATION OF ERNEST SPALETTA                    4:22-cv-00145-KAW

1    I, ERNEST SPALETTA, under threat of penalty of law and pursuant to 28 U.S.C.

2  § 1746, do hereby declare as follows:

3        1.    I make this declaration on behalf of the Point Reyes Seashore Ranchers

4  Association ("PRSRA"), as well as on behalf of myself and my family, Nichola Spaletta and

5  Ernest Spaletta Jr., in support of proposed intervenors' Motion to Intervene in the above-

6  referenced case.  I am competent to testify about the matters set forth herein and am over 18

7  years of age.

8  **Point Reyes Seashore Ranchers Association**

9        2.    I am a member and President of the PRSRA that seeks intervention in this case.

10       3.    PRSRA members include families who have owned and operated small ranches

11 within the pristine landscape that is now the Point Reyes National Seashore.  Many of the

12 families' history working their ranches spans back to the 1800s and they are proud to have

13 partnered with the National Park Service to create the Point Reyes National Seashore in the

14 1960s.  This partnership has provided our community with the unique opportunity to experience

15 the thriving relationship of traditional animal husbandry, local food production, and

16 undeveloped California coastline.

17       4.    The farmers and ranchers were key to the establishment of the Seashore in the

18 1960's, with many families choosing to transfer their inherited land to the NPS to ensure it

19 would remain protected from development.  In return, upon the Seashore's establishment, Point

20 Reyes Seashore Ranchers Association families received rights from the federal government to

21 remain on and operate their ranches.  This was in recognition of the families' long and vital

22 contributions to the historical, cultural, agricultural, and environmental attributes of the working

23 landscapes at the Seashore.  Since that creation of the Seashore, Association ranches have

24 honored this relationship by working with the NPS and the public to maintain the historical,

25 cultural, and environmental qualities of Point Reyes for the visiting public's enjoyment.

26       5.    In February 2016, three special interest groups brought a lawsuit against the NPS

27 which halted the NEPA process and threatened the rights of PRSRA families to continue to

28 ranch, live in and earn responsible livelihoods producing dairy and meat in the Seashore.

DECLARATION OF ERNEST SPALETTA                                4:22-cv-00145-KAW

*Resource Renewal Institute v. Nat'l Park Serv.*, Case No. 4:16-cv-00688-SBA (N.D. Cal.). PRSRA members intervened in the lawsuit on the side of the NPS and were involved in discussions that eventually resulted in a settlement requiring NPS to issue five-year interim leases, enabling them to continue their agricultural operations on the Seashore while the NPS undertook the new GMPA/EIS process. The PRSRA itself was a signatory on the eventual settlement agreement, along with its members. *Id.*, Dkt. No. 143. While the interim leases were beneficial, longer term permits are necessary for continued good land stewardship, investments into capital projects (e.g., fences and ranch building repairs) and the ability for the next generation of young ranchers to be able to carry on the ranching tradition. The current lawsuit threatens NPS's commitment to pursue those long-term leases pursuant to the GMPA/ROD.

6.      The PRSRA itself, in addition to its members, has regularly participated via comment letters and other public testimony offered to NPS and other relevant agencies as part of the GMPA/ROD development process. For example, the PRSRA has submitted written comments to the California Coastal Commission ("Commission") regarding the agency's consistency review and determination process assessing potential water quality impacts of the GMPA for the Point Reyes and north district of the GGNRA. Attached as **Exhibit 1** is a true and accurate copy of the PRSRA's comments to the Commission, dated January 4, 2021, in response to the Commission's staff recommendation of "conditional approval" of the GMPA. The PRSRA submitted written comments on the Draft Environmental Impact Statement for the GMPA issued in August 2019. Attached as **Exhibit 2** is a true and accurate copy of the PRSRA's comment letter, dated September 20, 2019. Additionally, the PRSRA and several of its individual members, offered testimony at the Commission's April 22, 2021 public meeting to discuss the proposed determination. The PRSRA continues to play an active part as an advocate on behalf of its members' interests.

**PRSRA Membership**

7.      The PRSRA has filed declarations on behalf of some, but not all, ranchers in the Association at this time in order to provide the Court with a sampling of the nature and various interests of the PRSRA's membership.

8. At this time, membership in the PRSRA includes the following lessees/permit holders (along with associated historic ranches):

- **A, D & E Ranches** – Betty Nunes
- **B Ranch** – Jarrod Mendoza
- **C & D Ranches –** Ernest and Nichola Spaletta
- **C. Rogers Ranch** – Fred and Ginny Rogers
- **F Ranch** – Tim Gallagher
- **G Ranch** – Kevin Lunny
- **Gallagher Ranch** – Robert Giacomini
- **Home & N Ranches** – Gino and Kathy Lucchesi
- **L Ranch** – Robert and Jolynn McClelland
- **M Ranch** – Rich and Jackie Grossi
- **McFadden Ranch** – Mike Giammona
- **McIsaac & Cheda Ranches** – Ted and Rhea McIsaac
- **Percy Ranch** – Paulette Percy
- **R. Giacomini Ranch** – Ralph Giacomini, Jr. and Luke Giacomini
- **Zanardi Ranch** – Louis and Wyatt Zanardi

Copies of Point Reyes and north district GGNRA leases/permits are publicly available at the following:  National Park Service, *Ranching and Dairying Lease/Permits*, https://www.nps.gov/pore/getinvolved/planning_ranch_cmp_leases_permits.htm (last visited Apr. 6, 2022).

**Interest of Spaletta Dairy and Spaletta Family**

9. I also have personal interests at stake, and knowledge concerning, this litigation. My family has lived on the Point Reyes Peninsula and operated cattle ranches and dairies for multiple generations.  My family's certified organic ranches are referred to as "C Ranch" and "D Ranch, pasture A" (collectively, Spaletta Dairy) and operate on approximately 850 total acres (718 acres on C Ranch, 132 acres on D Ranch, pasture A).  C Ranch was first established in 1859.  In 1946, my great aunt and uncle, Thomas and Virginia (née Grossi) Gallagher,

-4-

purchased C Ranch, and the Spaletta family has rented it from the Gallagher family since 1955, prior to the Peninsula becoming Point Reyes National Seashore.  In 1964, after Thomas passed away, Virginia sold C Ranch to the National Park Service.  C Ranch was the second ranch sold to the Park Service in order to create Point Reyes National Seashore.  Virginia's nephew, James Spaletta, continued to rent the land from the Department of Interior after the sale.  In 2003, then-Superintendent Don Neubacher rented D Ranch, pasture A to our family, and we have used this land for heifer grazing.  Today, the fifth generation of the Grossi-Gallagher-Spaletta family rents the land and operates Spaletta Dairy.

10.     After my family conveyed its land to allow the creation of Point Reyes National Seashore ("Seashore") in 1964, the use of these properties has been governed by long term leases, special use permits and other authorizations negotiated with the National Park Service, for terms of five years. The last five-year special use permit ran from February 1, 2006 through January 31, 2011.  From December 1, 2008 through November 30, 2013, D Ranch, pasture A also operated under a five-year special use permit.

11.     Thereafter, Spaletta Dairy has been governed by one-year letters of authorization ("LOA"), extending the terms of the lease/permits.  The first LOA was issued to us by the Park Service with the promise that they would manage the Tule elk at the Seashore that were coming into our ranch and disturbing our operations.  Following that, we were issued LOAs extending the rent and terms and conditions from the prior leases until December 31, 2016, and received assurances from Superintendent Cicely Muldoon that the planning process would proceed and consider a variety of issues, including elk management and the issuance of longer-term leases. Based on these assurances, my family agreed to interim one-year reauthorizations for our ranches because NPS had "committed to move quickly" on a comprehensive planning process and anticipated prompt decisions on the longer-term leases.  For years, we have waited patiently for NPS to issue long-term leases and to address the encroachment of the elk onto our dairy pastures.  We are still waiting, given that NPS has continued to offer only short-term authorizations pursuant to a settlement agreement in a prior case, *Resource Renewal Institute v. Nat'l Park Serv.*, Case No. 4:16-cv-00688-SBA (N.D. Cal.).

DECLARATION OF ERNEST SPALETTA                                    4:22-cv-00145-KAW

12.     Using Holstein and Jersey dairy cows, Spaletta Dairy produces organic milk that is sold to Sierra Organics.  Our dairy holds numerous certifications, reflecting our commitment to quality, organic dairy products.  We are certified in environmental stewardship by the California Dairy Quality Assurance Program, as well as the National Dairy Farm Program, which recognizes ranchers who practice responsible management of herd health.  We are recognized for having a comprehensive nutrient management plan with the California Natural Resources Conservation Services.  Spaletta Dairy is organically certified through California Certified Organic Farmers.  We also use sustainable and environmentally conscious practices to maintain and improve the land upon which our dairy sits.

13.     Spaletta Dairy is a benefit to the landscape, as well as to the agricultural and cultural heritage of the Seashore.  My family's organic dairying practices yield ecological and economic benefits to the Seashore, and enable people to view a working organic dairy farm, in addition to producing organic dairy products for the San Francisco Bay Area and beyond. There are fewer and fewer dairies in Marin County where people are able to view a working dairy farm in this type of cultural landscape.  We periodically provide tours of the historic C Ranch dairy, in order to educate the public about how milk makes its way from farm to table. In addition, our large red hay barn is well known to artists, and can be seen in many photographs and paintings of the Seashore landscape.  The "Spaletta Plateau" and "Spaletta Ponds" areas, both located on C Ranch, are popular locations for viewing many migrating birds and water fowl throughout the year, and are listed by many birding books as a prime location for birdwatching.  We welcome the many birdwatchers that frequent C Ranch year-round in order to pursue their hobby.

14.     My family's dairy contributes to the scenery and working landscape of Point Reyes National Seashore. Livestock grazing on the Point Reyes Peninsula has existed for hundreds of years.  Because we operate a dairy on the Peninsula, we are uniquely interested in maintaining the health and productivity of the land.  To that end, we use sophisticated, sustainable practices to ensure the future of Point Reyes National Seashore.  Our operations ensure that invasive species do not overwhelm the land, and we are continuously making

DECLARATION OF ERNEST SPALETTA                              4:22-cv-00145-KAW

improvements to protect the land from erosion.  We utilize Best Management Practices ("BMPs") by maintaining roads, watering areas and pastures with culverts, fencing, seeding, and practicing cattle rotation and pasture resting.  We also undertake efforts to protect the known rare plant species on C Ranch, including the beach layia, blue coast gilia, Point Reyes meadowfoam, and others.  Wild flowers at the Seashore are monitored by NPS staff, and certain rare plant species are flourishing in our cattle pastures.

15.     We work closely with NPS range specialists to manage sustainable grazing and other special uses of the land.  Specifically, we have undertaken a number of conservation projects, working collaboratively with the National Park Service, for the benefit of our surrounding environment. In particular, we have been forced, out of necessity, to collaborate extensively with the Park Service on fencing and other projects to the benefit of the Tule elk at the Seashore.  In the past few years, we have completed three large fencing projects on C Ranch.  In 2011, working with Park Service officials, we fenced off wetlands as part of the Luckenbach Fence Project, which provided funding through the Luckenbach Trustee Council to three organic ranches at the Seashore to fence off wetlands in the Drakes Bay Watershed.  In some areas, we used barbless wire to protect wildlife, and we lowered fence brace areas to allow for Tule elk crossings.  The goal of this project was to protect and/or restore the watershed area and monitor wildlife, including the Common Murre bird, which experienced significant losses resulting from Luckenbach oil spills along the coast of California.  We also repaired and replaced 2,300 feet of fencing that was damaged by elk, and we fenced a portion of land to use as a rotational pasture.

16.     In addition, employees of Spaletta Dairy make repairs to the fence bordering our ranches, as well as our pastures, almost daily due to impacts from roaming elk who cause damage to the fences and pastures.  As of October 2010, our documented costs for this damage totaled $32,354.13, outlined in a letter we sent to Superintended Muldoon.  Since then, our costs for repairing elk damage to the fence have spiraled to tens of thousands of dollars annually.  We also extensively recycle materials used in operation of the dairy, including steel, plastic rope, bailing twine, wire, glass, and aluminum, in order to maintain a clean and inviting atmosphere

DECLARATION OF ERNEST SPALETTA                                    4:22-cv-00145-KAW

for visitors to the Seashore, and to provide a safe environment for the public, livestock, and natural wildlife.  We have decreased our herd number, which has lowered our carbon omissions, and we utilize fertilizer year-round.  All of our manure practices comply with directives from the San Francisco Bay Regional Water Quality Control Board.

17.     My family's investments in the land and water to feed our livestock are also beneficial to the wide range of wildlife that share the landscape.  Livestock grazing is important for maintaining a suitable habitat for plants and animals known to occur here.  Removing the livestock will risk decreasing the quality and quantity of the coastal grassland habitat and the many environmental benefits it provides.

18.     In addition to making investments in the land and water, my family has made substantial investments in the infrastructure of C Ranch, including repairs to numerous structures on the land, including a large hay barn, main house, hay racks, dam levee, a drain in the horse field, and the feed tanks. We have made repairs to the service roads, fenced the stock ponds, and established water troughs. We have purchased pasture nutrient equipment, new dividers and corrals in the milk barn, a new wash system for the milk tank, organic fence posts and a milk barn compressor, and two pulsators for the milk barn.  We have also completed roof repairs on the calf barn.

19.     While my family has made substantial investments, we cannot continue to do so without some lease security beyond the current one-year LOAs.  We need assurances that we will be able to remain on the land and improve our operations during the pendency of the planning process and any subsequent litigation, and that the elk encroachment problem will be addressed at least on an interim basis during the planning process.  Without those assurances, we will be forced to put critical projects on hold and forego large-scale investments in and improvements to equipment, buildings, and infrastructure, due to the uncertainty of the leasing situation, elk management, and the planning process.

20.     Given the potential delay in the ranch management planning process and the uncertainty surrounding the issuance of future long-term leases, we are unable to sufficiently plan for expending funds on these types of projects.  The length of time needed to recover the

DECLARATION OF ERNEST SPALETTA                          4:22-cv-00145-KAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

substantial cost of these projects necessitates the security of a longer-term lease.   Moreover, many lending institutions, including federal government loan and grant programs, require proof of a long-term lease before they will consider giving money to Spaletta Dairy.  Our ability to access capital for conservation projects and business investments is severely limited given that we are unable to present documentation of a long-term lease to potential lenders.

21.     I have reviewed Plaintiffs' Complaint in this lawsuit.  Plaintiffs seek to preclude NPS from offering longer-term leases as authorized by the recent General Management Plan Amendment and Record of Decision ("GMPA/ROD") for the Point Reyes National Seashore. While unclear, it appears Plaintiffs also seek to restrict NPS from utilizing a range of elk management measures considered and authorized by the GMPA/ROD.  Either result would be catastrophic for Spaletta Dairy.

22.     I understand that NPS intends to manage the burgeoning Tule elk population at the Seashore using a variety of means as provided in the GMPA/ROD.  If the Court were to restrict NPS's ability to manage elk in a meaningful way, it would make managing the ranch unworkable.  The Tule elk were reintroduced to the Seashore by the Park Service over our opposition (and that of many other ranchers), and have impacted the dairy's operations on a daily basis.  The elk currently roam on many of the ranches, and each year the elk population increases.  They linger in the same areas, overgrazing the land and causing erosion, and do not have any natural predators that would naturally mitigate their population growth or deter encroachment onto ranch pasture lands.  Management of the elk is essential to keep the elk herds in their designated wilderness area (approximately 18,000 acres) and out of the Pastoral Zone, which is where the public intended them to remain, per the 1998 Tule Elk Management Plan and Environmental Assessment.

23.     It is impossible to overstate the problems posed to the ranches and dairies at the Seashore due to the elk. My family is unsure if we will be able to continue operating our dairy given the problems presented by the elk and the monetary damages caused by them.  If the elk are able to continue to access cattle pastures into the future, the elk will eventually force the ranchers out of business, regardless of the duration of any leases issued to the ranchers.  We

DECLARATION OF ERNEST SPALETTA                                    4:22-cv-00145-KAW

have had issues with the elk for the past 22 years, dating to the spring of 2000, when two elk appeared on our pasture out of the blue. Since then, the elk population has only grown, and there are now well over 200 elk that graze on ranchers' lands. Given NPS's decision in the ROD to increase the elk population threshold from 120 to 140, the elk are likely to continue, and likely increase the damage to the fences on our ranches on a daily basis, requiring our immense time and effort to make repairs and causing costly expenditures that are not in our budget. The elk graze on our land, making our cattle nervous, and overtaxing and causing loss of pasture for our cattle. This, in turn, leads to lower milk production by our cows.

24.     The elk jump fences we have erected and consume stock water meant for our cattle. We are forced to purchase additional water for our cattle from the Department of Interior, at our own expense. We must do this because the elk consume water from our water sources, leaving an insufficient amount for our cattle. The elk roam freely and trample on the trough pipes, plugging their flow and causing the cattle to run out of water. We must therefore haul water by hand to our cattle in certain fields during the dry months. Because of the damage the elk cause to our irrigation system, we also must repair and replace aluminum pipes.

25.     Spaletta Dairy is a sustainable, pasture-based dairy. Though my herd would otherwise have enough food to eat from the land itself, the elk often take resources, including the food, that the cattle rely on. As a result, I am forced to purchase supplemental feed and nutrients for my cattle from other ranches. Aside from the cost associated with purchasing additional feed, this also places my dairy at risk of losing its organic certification, since my cattle are forced to eat food from offsite. As part of the certification, we must graze our animals for at least 120 days during the grazing season, and they must receive at least 30% of their feed, or dry matter intake, from pasture each year. The elk are making these requirements more difficult for us to meet. Losing our organic certification would effectively end our business because organic dairies benefit from higher profit margins and we would not be able to survive in the current market as a conventional dairy. No conventional, non-organic milk is shipped from our area, and no trucking company will come to the Seashore to pick up milk from just one dairy.

-10-

26.     The current reality of our situation is that my family and I are dependent upon these future authorizations from the National Park Service to ensure our livelihood. Without authorization, my family will be forced to search for affordable land outside of Point Reyes National Seashore in order to move our dairy operations, or face total destruction of our business. Besides my family, Spaletta Dairy employs three other employees who live on the ranch with their families. Their livelihoods also depend on continued and future ranching authorizations from NPS.

27.     As a result of the potential disruption in the leasing and planning process, future generations of Spalettas, including my children, are unsure if there will be an opportunity to be involved in the family dairy business in the future, given the uncertainty surrounding the ranch management planning process and issuance of long-term leases. Without the issuance of long-term leases, and without comprehensive ranch planning and elk management, the next generation cannot make educational and financial commitments towards continuing the family business, because we do not know how long we will be permitted to continue our dairy at Point Reyes National Seashore.

28.     In short, the lawsuit and the further delays in the planning process have put my family's multigenerational business in jeopardy. We are unable to develop a succession plan with the next generation of Spalettas, and we are unable to make sound decisions regarding investment in the future of our sustainable agricultural operations and BMPs. This substantially interferes with the ability of our family (along with other PRSRA ranchers) to continue to invest in our business and the sustainable and organic land management practices that have contributed to the cultural, historic, and natural vibrancy of Point Reyes National Seashore.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Dated: 4·17·22

Ernest Spaletta

-11-

DECLARATION OF ERNEST SPALETTA                                    4:22-cv-00145-KAW

**EXHIBIT 1**



January 4, 2021

California Coastal Commission
Federal Consistency Program
455 Market Street, Suite 300
San Francisco, CA 94105

>Re: Comments Regarding the Conditional Approval Recommendation for the General
>Management Plan Amendment for the Point Reyes National Seashore and the North
>District of Golden Gate National Recreation Area.

Dear Coastal Commission:

The Point Reyes Seashore Ranchers Association ("the Association") wrote in December to urge the California Coastal Commission ("CCC or Commission") to fully approve the National Park Service's Coastal Act Consistency Determination for the General Management Plan ("GMP") Amendment for the Point Reyes National Seashore and North District of Golden Gate National Recreation Area (the "Seashore"). The Association is writing as a follow-up to our previously submitted comments, and urge that the Commission not to adopt the staff recommendation to only conditionally approve the GMP.

The CCC staff report recommends that the Commission include a condition that the Park Service provide the Executive Director for review and approval, a water quality assessment plan for the Drakes Estero, Abbotts Lagoon, and the Pacific Ocean before new leases with ranchers are finalized.  The staff recommendation is inconsistent with the facts in the GMP Amendment, favorably cited by the staff, that support the effectiveness of ranchland and dairy best management practices to maintain water quality throughout the Seashore, is contrary to state law that vest the California Water Resources Board and the Regional Water Quality Control Boards ("Water Quality Board") with the sole authority to regulate in matters relating to water quality in this instance, and ignores the Waste Discharge Requirements and related Waivers approved for dairies by the San Francisco Bay Regional Water Quality Board.

The staff report ignores or dismisses several important points. First, the staff report essentially ignores that the Park Service has conducted a peer reviewed water quality assessment of best management practices used in the Drakes Estero, Abbotts Lagoon, and ocean watersheds which

1

Exhibit 1 - Page 001

is included in the GMP as Appendix L. The peer reviewed analysis is entitled - <u>Coastal Watershed Water Quality Analysis</u>, "Improved Water Quality in Coastal Watersheds at Point Reyes National Seashore Associated with Rangeland Best Management Practices, 2000-2013."

Second, the Commission staff report did consider that the GMP has adopted best management practices required in current and new leases such as fencing, deleting riparian areas from cattle use, infrastructure for manure management, off-stream drinking water systems for cattle, and pond restoration for dairy and beef ranch operations to improve water quality based on monitoring in the Olema, Lagunitas, and Tomales Bay watersheds. However, the staff report fails to make the connection that the best management practices that it cites favorably and used on the ranchlands and dairies in the Olema, Lagunitas, and Tomales Bay watersheds, are also being used on the ranchlands and dairies in the Drakes Estero, Abbotts Lagoon, and ocean watersheds.

Third, the RWQCB adopted requirements for all dairies throughout the region including in the Drakes Estero, Abbotts Lagoon, and ocean watersheds, and already requires them to implement facility monitoring plans, waste and grazing management plans, and a nutrient management plan for any application of animal waste to land.

Finally, the Commission staff report apparently assumes that the SFB Water Quality Board has not done its job and the staff report's call for a water quality monitoring program for the Drakes Estero, Abbotts Lagoon, and ocean watersheds, is contrary to the state legislation vesting water quality matters with the State Water Resources Board and Regional Water Quality Control Boards.

**The Staff Recommendation Ignores that the GMP Amendment Will Implement Best Management Practices that have Proven Effective for Maintaining Water Quality**

The Commission staff report largely ignores the analysis of 13 years of water quality data for the Drakes Estero, Abbotts Lagoon, and ocean watersheds and the conclusions that best management practices implemented there over this period resulted in significant improvement of water quality similar to the improvements documented in the Olema, Lagunitas Creek, and Tomales Bay watersheds.  The peer reviewed Park Service analysis and conclusions are in the 2020 Report "Improved Water Quality in Coastal Watersheds at Point Reyes National Seashore Associated with Rangeland Best Management Practices, 2000-2013" for the Drakes Estero, Abbotts Lagoon, and ocean watersheds. GMP App. L.

The Water Quality Report concluded that, "While livestock grazing on public lands introduces fecal coliform bacteria into surface waters, our results further support previous studies showing that BMPs can dramatically, effectively, and rapidly reduce FIB and increase the probability of meeting water quality objectives." GMP App. L at 3.

In fact, the results of the Park Service water quality analysis of best management practices in the Drakes Estero, Abbotts Lagoon, and ocean watersheds are consistent with water quality

Exhibit 1 - Page 002

improvements "associated with grazing BMPs from studies in other watersheds (e.g. Kay et al. 2018, O'Callaghan et al. 2018) and elsewhere within the Point Reyes National Seashore (Lewis et al. 2019)." GMP App. L at 21.

The Commission staff report also does not mention the benefits gained by conversion from conventional to organic dairies that occurred in the mid to late 2000 in the Drakes Estero, Abbotts Lagoon, and ocean watersheds.  As the Park Service Water Quality Report explains:

> "Changes in management not documented in this study could have also contributed to reductions in FIB concentrations. This included conversion of the dairies to organic operations in the mid to late 2000's (2006 for I and J ranches, 2011 for L Ranch). General changes associated with this conversion included . . . adherence to number of regulatory requirements under the National Organic Program including management to prevent runoff of wastes and contaminated waters to adjoining or nearby surface water, . . . and practices for erosion control and the protection of natural wetlands and riparian areas (National Organic Program 200910). Improved pasture management practices related to these requirements may have also contributed to observed declines in FIB concentrations, for example by increasing use of rotational grazing or ground cover in high use areas (see Lewis et al. 2009)." GMP App. L at 21-22.

There is more than an adequate record and analysis in the Park Service GMP Amendment to support its conclusion that the GMP Amendment is consistent with the Coastal Act and that best management practices will protect water quality in the Drakes Estero, Abbotts Lagoon, and ocean watersheds.

**The Commission Staff Report Already Accepted that the Park Service Best Management Practices Improved Water Quality to Acceptable Levels in the Olema, Lagunitas Creek and Tomales Bay Watersheds and there is No Basis to Conclude that the Same Practices Implemented Across the Ridge in the Drakes Estero, Abbotts Lagoon and Ocean Watersheds Will Not Protect Water Quality.**

The Commission staff evaluated the information about range and dairy practices in the Olema, Lagunitas Creek, and Tomales Bay watersheds and concluded that the, "existing information resulting from water quality monitoring efforts appears to support the NPS conclusion that in the Olema and Lagunitas Creek watersheds, implemented grazing and ranching practices have resulted in improvements to water quality in the Tomales Bay watershed." Staff Report at 40. In particular, the purpose of the monitoring was to "to assess if watershed enhancement efforts, such as those related to ranches and cattle grazing, are resulting in water quality improvements." Staff Report 39-40.  The staff cited with approval that:

> "following establishment of the TMDL in 2007 and the focused efforts to separate cattle activity from the creeks, a 2016 RWQCB 'report card' indicated that the TMDL fecal coliform target was being met in Lagunitas and Olema Creeks (RWQCB 2016). A more recent study (Lewis et al. 2019) documented significant (up to 95%) reduction in fecal

3

Exhibit 1 - Page 003

coliform concentrations in Olema Creek following implementation of 40 grazing best management practices (fencing, hard stream crossings, placement of off-stream drinking water for cattle), based on monitoring conducted between 2000 and 2017. Additional sampling of beaches along Tomales Bay conducted by Marin County during the dry season (April through October) also indicates that water quality standards are typically met during the spring and summer months." Staff Report at 40.

If the Park Service were to reject or adopt less stringent best management practices for the Drakes Estero, Abbotts Lagoon, and ocean watersheds than those applied in the Olema, Lagunitas Creek and Tomales Bay watersheds, then the Commission staff recommendation to halt issuance of new leases to ranchers might be justified. But where those best management practices will be the same, and the practices have been shown to be effective at protecting water quality to the Commission's staff satisfaction in the Olema, Lagunitas Creek and Tomales Bay watersheds, there is no justification for only a conditional finding of Consistency with the Coastal Act, especially when the GMP Amendment contains a peer reviewed analysis that concludes that the practices applied in the Drakes Estero, Abbotts Lagoon, and ocean watersheds effectively protect water quality.

**The Commission Staff Recommendation is Contrary to the State Legislation Vesting the Regulatory Authority for Water Quality with the Water Resources Board and Regional Water Quality Control Boards.**

Public Resources Code section 30412(b) emphasizes that the "The State Water Resources Control Board and the California regional water quality control boards are the state agencies with primary responsibility for the coordination and control of water quality. . . . The commission shall assure that proposed development and local coastal programs shall not frustrate this section. The commission shall not, except as provided in subdivision (c) [for waste water treatment plants], modify, adopt conditions, or take any action in conflict with any determination by the State Water Resources Control Board or any California regional water quality control board in matters relating to water quality or the administration of water rights."

The Commission and State Water Resources Board have also entered a Memorandum of Understanding that similarly requires that the Commission, "subject to limited exceptions regarding wastewater treatment plants, shall not modify, adopt conditions, or take any action in conflict with any determination by the SWRCB or any RWQCB in matters relating to water quality or the administration of water rights." MOU Feb. 2000.

The GMP Amendment's water quality best management practices were not prepared in a vacuum and this is not a case where the State Water Resources Board and the SFB Water Quality Board have failed to act.

The GMP Amendment explains that the SFB Water Quality Board has worked with the Park Service to develop best management practices. "Concurrent with FIB monitoring, ranch operators, NPS, the San Francisco Bay Regional Water Quality Control Board (SFBRWQCB) and

4

Exhibit 1 - Page 004

others collaborated to implement approximately 30 BMPs across the study area in the following categories: (1) ranch infrastructure improvement, including the installation of loafing barns, roofs, gutters and piping to manage the location of dairy cattle feeding and loafing, divert runoff from manured areas and reduce erosive surface area; (2) fencing, to exclude cattle from streams and erosive areas, or create seasonal or rotational pastures; (3) manure management to contain manure in storage ponds or distribute it to low-slope fields via pipelines; (4) livestock water supply to provide alternative off-stream drinking water for cattle; and (5) a pond restoration involving the repair of a levee to reestablish holding capacity, fencing and piping to troughs." GMP App. L at 10.

The ranches and dairies must also comply with stringent water quality management requirements that govern agricultural nonpoint source pollution. For example, the ranches must comply with the Grazing Lands and Dairy Conditional Waivers for Waste Discharge Requirements approved and implemented by the SFB Water Quality Board. Order No. R2-2015-0031. The dairies on the Seashore, all of which are entirely or partly in the Drakes Estero, Abbotts Lagoon, or ocean watersheds are governed by the Conditional Waiver. As the SFB Water Quality Board has explained "A major focus of nonpoint source staff activities in Region 2 has been working with dairies in Marin and Sonoma Counties. We completed inspections and surveys of all dairies . . . In October 2003, the Board issued a general permit for dairies that were not fully in compliance and a [conditional] waiver of WDRs for those meeting standards" such as the dairies in the Seashore. https://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/nps/index.html. The waiver conditions "requires structural and non-structural management measures for all confined production areas, land application areas and grazing operations, as well as a site-specific monitoring program." https://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/agriculture/CAF.html.

The dairies are required to file an annual report about their management practices and water quality monitoring. The SFB Water Quality Board explains that "The objective of the Annual Report is to provide compliance updates, demonstrate that the dairy is ready for the rainy season, document required water quality monitoring and actions taken to correct identified problems, and to demonstrate that each facility is operating in compliance with the requirements of Order No. R2-2015-0031 (Conditional Waiver)." https://www.waterboards.ca.gov/sanfranciscobay/water_issues/programs/agriculture/CAF/2018%20Dairy%20Waiver%20Annual%20Report%20form.pdf. The SFB Water Quality Board is in the process for dairies that are currently subject to the conditional waivers of enrolling the dairies into the general waste discharge requirement permits.

The legislature enacted Public Resources Code section 30412(b) giving the Water Boards authority over water quality matters and limited the Commission to addressing the siting of water treatment plants for a reason. It is the Water Boards that have the expertise to

5

Exhibit 1 - Page 005

determine best management practices and monitoring requirements to maintain water quality and the SFB Water Quality Board has done so in detail for the Seashore.

**No Where Does the Coastal Act Require a Water Quality Monitoring Program to Achieve Consistency with the Coastal Act and the Staff Recommendation Fails to Address that Promoting Agricultural Use is Fully Consistent with the Coastal Act Policy to Promote Agriculture**.

The staff report failed to address Coastal Act policy for land resources, Coastal Act Section 30241, "Prime agricultural land; maintenance in agricultural production. The maximum amount of prime agricultural land shall be maintained in agricultural production to assure the protection of the areas' agricultural economy." The Commission emphasizes that: "The Coastal Act includes provisions to protect and enhance coastal resources and land uses, including agriculture. Strong protection of agricultural lands and the agricultural economy in the coastal zone is mandated by the Coastal Act. These protections include requiring that prime agricultural lands be maintained in agricultural production, restricting the conversion of agricultural lands to other land uses, conserving agricultural soils, and promoting long-term agricultural productivity." Coastal Commission, https://www.coastal.ca.gov/agriculture/. The staff report's glaring omission of addressing consistency of the GMP Amendment with the agricultural policy of the Coastal Act is of concern because it provides necessary context with the staff report's evaluation of consistency with other coastal Act policies since the GMP Amendment is designed to address the continuation of a century of agriculture on the Seashore. As explained in our December letter, the ranches are essential to many local and regional businesses and Marin County agriculture is recognized as a leader in California's agricultural sustainability movement and local food security. The PRSRA family ranches contribute important historical, cultural, social, educational, scenic, environmental, and economic values that benefit the Seashore. The importance of the working dairies and ranches on the Seashore has been recognized by the designation of the Point Reyes Peninsula Dairy Ranches Historic District and the Olema Valley Dairy Ranches Historic District listed in the National Register of Historic Places.

The Coastal Act does not compel a water quality monitoring program but does require the maintenance of agriculture. Requiring a monitoring program for the Drakes Estero, Abbotts Lagoon, and ocean watersheds is not a necessary precondition to issuing ranch leases where the Park Service has already spent years in cooperation with the SF Bay Water Quality Board, Marin Resource Conservation District, and other stakeholders identifying and implementing the ranchland practices and zoning of uses proven to maintain water quality and the SF Bay Water Quality Board carefully regulates dairy best practices, monitoring, and reporting requirements.

**The Commission Should Not Dictate to Federal Land Managers the Implementation of a Water Quality Monitoring Program**.

6

Exhibit 1 - Page 006

The staff recommendation to refuse authorization of dairying and ranching under the GMP Amendment until the Commission Director approves a water quality monitoring program injects the Commission into dictating management procedures to federal land managers. We believe that the requirement exceeds the Commission's authority and improperly interferes with the management of federal lands.

## Conclusion

The dairy and ranching families of the Point Reyes Seashore urge the Commission to concur with the Park Service's determination that the GMP Amendment is consistent with the Coastal Act. Moreover, the Commission staff report recommending conditional approval to force the Park Service to prepare a water quality monitoring plan for the Drakes Estero, Abbotts Lagoon, and ocean watersheds is not necessary given that the staff ignored the water quality assessment of best management practices for the Drakes Estero and Abbotts Lagoon watersheds in Appendix L, and already favorably cited the monitoring conducted for best management practices in the Olema, Lagunitas Creek, and Tomales Bay Watersheds under implementation of the same best management practices that will be used on ranches and dairies in the Drakes Estero, Abbotts Lagoon, and ocean watersheds.  The staff Report recommendation is also contrary to state law given that it is the Water Resource Board and the SFB Water Quality Board that have authority over water quality matters and the Boards have responsibly exercised that authority in authorizing environmentally responsible operation of the dairies and worked with the Park Service and developed best management practices for ranchland.

Sincerely,


Ernest Spaletta, President
Point Reyes Seashore Ranchers Association

Exhibit 1 - Page 007

**EXHIBIT 2**



Point Reyes Seashore
Ranchers Association

September 20, 2019

Superintendent Cicely Muldoon
Point Reyes National Seashore
1 Bear Valley Road
Point Reyes Station, California 94956

Dear Superintendent Muldoon:

The Point Reyes Seashore Ranchers Association (PRSRA), appreciates the opportunity to comment on the Point Reyes National Seashore (PRNS) and North District of Golden Gate National Recreation Area (GGRNA), (collectively the "Seashore), draft Environmental Impact Statement (EIS) for the General Management Plan Amendment. This letter is the PRSRA's response to the draft EIS, acknowledging and supporting submission of separate comments by individual ranchers.

Last year, the Association commented on the Park Service's request for comments to the Notice of Intent for preparing the Environmental Impact Statement for a General Management Plan. The following comments build on our prior comments and pose questions requiring clarification to items addressed in the draft EIS.

We support the varied uses and environmental value of the PRNS and the GGNRA and believe the National Park Service (NPS) has developed a draft environmental impact statement (DEIS) for the General Management Plan Amendment (GMP Amendment) that raises many of the important issues related to dairy and ranch management. However, we believe the GMP Amendment and the preferred alternative have overlooked several key issues and must be better designed to recognize the historical, cultural, social, educational, scenic, and environmental values and opportunities of the working dairies and ranches in the limited area of the PRNS and GGNRA recognized as the Point Reyes Peninsula Dairy Ranches Historic District and the Olema Valley Dairy Ranches Historic District.

While we generally support Preferred Alternative B, the continued ranching alternative, presented in the draft EIS, there remain areas of concern that need to be addressed to achieve the goals for the GMP Amendment and the intent of the PRNS and GGNRA enabling legislation. These items include:

Exhibit 2 - Page 001

1. <u>Establish an Advisory Committee to assist NPS on agricultural issues</u>. To provide additional agriculture expertise, it should establish a PRNS Agricultural Advisory Committee, made up of such local agricultural and natural resource conservation experts as a representative from the local office of the USDA Natural Resource Conservation Service, the Marin County Resource Conservation District, the Marin County Agricultural Commissioner's Office, the University of California Cooperative Extension, and the Marin Agricultural Land Trust to advise PRNS decision makers on all agricultural planning and management decisions.

2. <u>The Draft "Foundation Document" must be revised to recognize the existence and importance of ranching as part of PRNS</u>. The draft Foundation Document will provide basic guidance for planning and management decisions. The draft Foundation Document is significantly deficient because it mostly fails to recognize historic and culturally important dairy and ranching. The Document contains several sections including Park Purpose, Park Significance, and Fundamental Resources and Values. All of these sections should be revised to recognize that the ranches can help to perpetuate the coastal grassland ecosystem, increase environmental awareness, promote the ethic of land stewardship and sustainable agriculture, support the local foodshed, and continue to favorably influence regional trends in the way food is produced, distributed, and consumed.

3. <u>The DEIS seriously misleads the public and distorts the no-action alternative because it assumes no limit on the population level or geographic extent of tule elk at PRNS</u>. The current applicable plan for tule elk at PRNS is the 1998 Tule Elk Management Plan and EA. The Elk Plan "did not contemplate the expansion of elk into the ranchlands." DEIS p.5. However, the no action alternative which is used as a reference to describe the impacts and change that would occur in other DEIS alternatives, characterizes those alternatives as a reduction in the existing population level and the wide geographic spread of elk. In fact, given that the 1998 Elk Plan did not provide for elk on ranchland, the EIS must disclose that the alternatives that allow elk on ranchland amount to a huge and significant increase in elk. The failure to accurately characterize the current Elk Plan limitation that precludes elk on ranchland, distorts the effects of the alternatives in violation of the National Environmental Policy Act (NEPA). The NPS also violated NEPA and other management direction when it failed to exclude elk from ranchlands and follow the 1998 Elk Plan.

4. <u>The preferred alternative must have a map that clearly establishes a limit on the geographic extent of tule elk</u>. The only map regarding tule elk is Figure 2 which shows the current extent of elk in the planning area. DEIS A-2. The preferred alternative should include a map of the location where elk are permitted. Without a map of the permitted area, resource conflicts will arise.

5. <u>The preferred alternative should exclude elk from the ranch land</u>. Elk should be allowed on the PRNS but the Drakes Beach herd and the Limantour herd should not be present on the limited area of the PRNS which have ranches. This is because over the last 30 years NPS has not figured out how to effectively separate elk from cows; it would be better for elk if they are allowed to roam undisturbed in a much larger natural habitat in the Phillip Burton Wilderness instead of being subject to harassment, hazing, and lethal removal on ranch land; the elk consumption of forage will threaten the organic certification of ranches; elk damage ranch fences; elk consume forage that would otherwise be available to support cattle. If elk consume livestock pastures and

Exhibit 2 - Page 002

supplemental forage for cattle is necessary, NPS should bear the cost of that forage. Also, elk were not part of the Dairy Ranches Historic Districts.

6. <u>A fence should be constructed to effectively separate elk between the ranches and the Phillip Burton Wilderness area.</u> The DEIS dismisses the possibility of an elk fence to keep elk in the larger Phillip Burton Wilderness. The elk fence could be designed and located to be only about 4 miles long, to terminate on the Inverness Ridge in dense vegetation, a wooded area, or at a significant drop off. A livestock fence already exists in this area, so it is readily accessible to build an elk fence. We believe the cost would be reasonable and, together with maintenance costs, would be much less costly than ongoing hazing, repair of ranch fences damaged by elk, and lethally removing elk.

7. <u>The preferred alternative must establish a population level for the maximum number of elk in the areas where elk are permitted.</u> In addition to providing a map that delineates the location where elk will be permitted, the EIS should set the maximum number of elk allowed in the area delineated. The number will guide management decisions and determine when the herd is beyond the permitted management capacity.

8. <u>The analysis of diversification in the DEIS is incomplete and lacks historical and regional context.</u> The DEIS gives the public the false impression that the diversification sought by ranchers is new and expansive. The final EIS should explain that farming and ranching outside the planning area is far more diverse. In addition, within the planning area farms and ranches historically included both irrigated and non-irrigated row crops including beans, peas, barley, artichokes and other vegetables and a wider variety of livestock species such as hogs and sheep.

9. <u>The limitation of row crops to 2 ½ acres, permitted only in the ranch core, with irrigation and organic mulches prohibited, is unnecessarily restrictive and will not meet NPS goals.</u> We appreciate the consideration of allowing ranches to diversify with some row crops. However, the limitations are so restrictive that they will not allow NPS to meet its goal for ranchers to respond to poor forage production years and fluctuations in economic markets. Only 2 ½ acres for the 24 ranching families amounts to less than 75 acres out of the 28,000 acres of ranch land. The core restriction is unreasonable because there may be more suitable soil for row crops outside the ranch core. Prohibiting irrigation severely limits crop varieties that can be grown. Non-pathogen, weed-free mulch from within the planning area should be allowed since weed-free straw is not available inside the planning area. The baseline restriction should be relaxed to allow up to 75 acres of row crops, on suitable soils within a mile of the ranch core, using mulch, and irrigation if excess water is available. We do not anticipate all ranches would elect to grow row crops.

10. <u>The diversification that allows sheep and goats is too restrictive and will not achieve NPS goals of preserving open coastal grasslands.</u> Diversification to allow sheep and goats could be helpful since these animals reduce the fuel load and graze on brush which encroach on grasslands threatening open vistas, wildlife habitat, and native plants. Unfortunately, sheep and goats are limited to the ranch core and pasture sub-zones. Management to limit brush encroachment in

Exhibit 2 - Page 003

these subzones is already allowed such as planting, mowing, hay and silage production. These management practices are prohibited or more limited in the range subzone. NPS should provide more flexibility to allow sheep and goats to browse within the range subzone where there is a more significant threat to grassland by wildfire and brush encroachment and fewer tools available to control the brush.

11. <u>The DEIS fails to recognize the environmental benefits of diversified farming and ranching</u>. Diversified agriculture can provide important wildlife habitat and soil conservation benefits that should be considered in the DEIS. For example, vegetable waste from row crops can be fed to hogs and the hog manure can be composted with other organic materials to use on row crops or pastures.

12. <u>NPS should consider educational benefits and enhanced visitor experience from diversification</u>. We urge the Park Service to include other diversification such as minor on-farm processing, on-farm sales of products produced in the planning area, and farm tours. This will help enhance the visitor educational and recreational experience goals stated in the Purpose and Need.

13. <u>The beneficial impacts to soils from carbon farming was not considered</u>. The DEIS only considers adverse impacts to soils as a result of dairying and ranching. The NPS should consider carbon farming and the ecological benefits of implementing a carbon farm plan that would improve soils, increase soil carbon, and increase organic matter to benefit water quality and air quality. The NPS should consult with the Marin Carbon Project, Carbon Cycle Institute, and Marin Resource Conservation District who have expertise in this area. There is no excuse to ignore the beneficial effects of carbon farming.

14. <u>The DEIS incorrectly equates fertilizer to compost and prohibits both. The use of organic compost should be allowed on all ranches</u>. The DEIS fails to understand the benefits of soil amendments and inputs on soil health. Weed-free and pathogen-free compost can improve soil fertility enhancing water retention to minimize runoff and help sequester carbon. NPS should consult with the Natural Resource Conservation Service, the Marin Resource Conservation District, and University of California Cooperative Extension Service to analyze the best nutrient management practices that can be used on both dairies and ranches to improve soil health.

15. <u>Nutrient management should be allowed on beef ranches and not be limited to dairies</u>. Dairies have more productive soils than beef ranches because dairies feed their cows nutrient rich concentrated feeds, they have more cows per unit area than allowed for beef ranches, and dairies spread manure on pastures, all increasing the fertility of the soils. The preferred alternative only allows soil fertility improvements on the pasture subzone, but soil fertility should also be allowed on the range subzone at least with compost on both dairies and beef ranches.

16. <u>The DEIS fails to accurately assess air quality impacts from beef ranching relative to other uses of the PRNS</u>. Since beef cattle spend most of their time on pastures and rangeland and not on bare ground, and are just occasionally gathered for removal from ranch land, the DEIS conclusion that beef cattle are the primary source of dust is unsupported. The DEIS also is misleading because it concludes that ranching represents 87% of the greenhouse gas emissions

Exhibit 2 - Page 004

while vehicle emissions from the several million seashore visitors is less than 20%. However, this ignores the emissions from vehicles as visitors drive to and from the PRNS.

17.  It is unclear how the reserve account(s) would operate and whether the reserve(s) account for NPS' elected deferred maintenance.  It is unclear whether one reserve account will be established that is available for maintenance on all the ranches or whether individual reserve accounts will be created for each ranch.  It is equally unclear whether NPS would contribute to the reserve account given that NPS has not maintained the infrastructure on the ranches and should bear some financial responsibility to bring the infrastructure up to useable and safe condition.

18.  Ranch Operating Agreements should not require new NEPA review and ESA consultation every year.  The DEIS states that "The ROA would be updated or reauthorized following the annual meeting." DEIS P.36.  The DEIS does not define "updated" or "reauthorize."  Both these terms, especially "reauthorize" indicate a new decision each year that will require NEPA review and ESA consultation.  This will grind implementation of the Plan to a halt and create annual opportunities for litigation.  This is not in the interest of the NPS which has limited budgets and staff, and is not in the interest of accomplishing resource improvements, whose implementation will be repeatedly stalled.  The annual meeting about the ROA and related documentation should be referred to as "implementation" of decisions previously made in the GMP Record of Decision and not an update or reauthorization. Otherwise, you are creating an annual opportunity to attack and stall the decisions which is not in the interest of good resource management.

19.  We have concerns with your requirement in the lease addendum that states lease holders' primary residence must be in the Park.  This may not be feasible in many instances.  The requirement of residency in not necessarily correlated to good stewardship of the leased property. We propose that the language states that the lease holder be directly involved in the day-to-day management of the operation of the leased agriculture property.  The lease holder or his/her immediate family member should be the owner/operator of the agricultural operation.  Subletting should not be allowed.

The GMP Amendment is the foundation for providing the cultural resource, natural resource, and economic benefits envisioned by Congress when it established and preserved these magnificent areas and provided for continued ranching and dairying on the agricultural property. The Association is honored and grateful to be part of this longstanding history and we take great pride in continuing to ensure that ranching and dairying contribute to the agricultural heritage of Marin County and promote the environmental and scenic quality of the working landscapes of the Seashore. We also value our working ranches which provide an opportunity for the public to learn about where and how their food is produced and to learn more sensible ways of raising animals to provide our country with high quality agricultural products.  The recent designation of historic ranches within the Park to the National Registry of Historic Places status supports the agricultural heritage of the ranches within the Park.

Exhibit 2 - Page 005

Please consider our comments stated in this letter and the previous scoping comments when preparing the final EIS.  Thank you.

Sincerely,

Point Reyes Seashore Ranchers Association

Exhibit 2 - Page 006