Tony Francois, Cal. Bar #184100
BRISCOE IVESTER & BAZEL LLP
235 Montgomery Street, Suite 935
San Francisco, California, 94104
Telephone:      (415) 402-2700
Facsimile:      (415) 398-5630
Email:          tfrancois@briscoelaw.net

Caroline Lobdell, Ore. Bar #021236, *pro hac vice forthcoming*
Aaron Bruner, Ore. Bar #133113, *pro hac vice forthcoming*
WESTERN RESOURCES LEGAL CENTER
9220 SW Barbur Blvd., Suite 119 #327
Portland, Oregon 97219
Telephone:      (503) 768-8500
Facsimile:      (503) 222-3255
Email:          clobdell@wrlegal.org
                abruner@wrlegal.org

Attorneys for Proposed Defendant-Intervenor
POINT REYES SEASHORE RANCHERS ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE; CENTER FOR BIOLOGICAL DIVERSITY; and WESTERN WATERSHEDS PROJECT, <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL PARK SERVICE, a federal agency, <br><br> Defendant, <br><br> POINT REYES SEASHORE RANCHERS ASSOCIATION, <br><br> Proposed Defendant-Intervenor. | Case Number: 4:22-cv-00145-KAW <br><br> **DECLARATION OF GINO LUCCHESI** |

I, Gino Lucchesi, under threat of penalty of law and pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1. I make this declaration in support of proposed intervenor's Motion to Intervene in the above-referenced case. I am competent to testify about the matters set forth herein and am over 18 years of age.

2. I am a member of the Point Reyes Seashore Ranchers Association ("PRSRA") that seeks intervention in this case and I have personal interests at stake, and knowledge concerning, this litigation. In 1904, my grandfather immigrated to the Point Reyes area and around 1932, he began to earn a living crop sharing on what is now known as the Point Reyes National Seashore as the "Home Ranch." Later, in 1941, when the war broke out, my grandfather and other family members (including my father) were forced to evacuate. My family relocated into the town of Point Reyes and found alternative means to make a living. Some of my family members joined the military. I was later born in 1952 and grew up in Inverness Park, just outside the Point Reyes National Seashore ("Seashore"). I have lived in the area my entire life.

3. Our family business name is McDonald Lucchesi Cattle. Our family business currently consists of three ranches: The McDonald Ranch, the Home Ranch, and the N Ranch. The Home Ranch and the N Ranch are located on the Seashore and are subject to the National Park Service's ("NPS") General Management Plan Amendment and Record of Decision ("GMPA/ROD") for the Seashore that plaintiffs here seek to declare unlawful. By way of my wife's family, Kathleen McDonald Lucchesi, whom I have been married to for 49 years, our family acquired the Home Ranch in 2003, bringing the Home Ranch into my family circle once again.

4. My father-in-law resided on Pierce Point Ranch from around 1965 until around 1980, when the federal government forced him to vacate the Pierce Ranch so that they could repurpose the Pierce Point Ranch for a tule elk reserve. This was a bitter, contentious, and painful fight between the McDonald family and the NPS and is an example of how ranchers may disagree with the federal management of tule elk on the ranch lands of the Seashore.

5. McDonald Lucchesi Cattle has two ranches subject to the GMPA/ROD: the Home Ranch and the N Ranch, leased along with the associated barns and garages. Both are engaged in cattle ranching. We also have incidental use of a residence on the Home Ranch.

6. The income derived to our family business from the Home Ranch and the N Ranch provide an important source of income, livelihood, and economic well-being for our family. Without the ability to graze our livestock on the Seashore, me and my family, and our family business, would experience significant harm. On the N Ranch we are authorized to graze 1,080 Animal Unit Months ("AUMs") or, on average, 90 animal heads annually. On the Home Ranch, we are authorized to graze 3,600 AUMs or 300 animal heads on average annually, though we have reduced our cow number by 20% at the request of NPS.

7. For both ranches, we previously operated under five-year special use permits ("SUPs"). We had understood from the federal government that long-term authorizations would be granted. However, as NPS began to develop the Ranch Comprehensive Management Plan, a precursor to the GMPA/ROD process, starting in early 2014, NPS began to authorize grazing only one year at a time. In 2017, the U.S. Department of Justice filed a multi-party settlement agreement beginning the GMPA/ROD development process and again authorizing only short-term leases while NPS developed the plan amendment. These short-term authorizations create great uncertainty in our capital investment decisions, like how much to invest in fence improvements and other capital improvements to benefit ranch operations. In sum, the short-term authorizations hinder our ability to ensure the stability of our multi-generational family business.

8. Our family ranch works hard to maintain the land we use and to be ecologically sustainable. Some of our efforts include fencing miles of creeks and wetlands to help protect plants and wildlife. We have also fenced out two Native Indian archaeological sites. We dispersed water sources and rocked around water troughs so mud would not form. We also care for nearby roads by thoughtful implementation of water bars to help with erosion control. We are currently also involved in a community effort to help control invasive plants from overcrowding the native plants, which has become somewhat of a greater problem given that

NPS has limited some of the more common practices we have used to control invasive species. We clean stock ponds so that they will hold more and cleaner water. We cemented our feeding barn to reduce mud and sediment. We rotate rest pastures so that livestock are not constantly on the same area. We are also very sensitive about driving in the pasture during wet season, when the ground is soft and subject to compaction. We have picked up and continue to pick up old wire and falling fences from prior years. There are public trails on the Home Ranch and me and members of my family have directed many a lost hiker, answered their questions about ranching and the area's history, and have even given a few elders a ride back to the parking lot.

9. As described above, I am personally fully invested in the administration of the public lands of the Point Reyes National Seashore (including being part of a family that has contributed to the quality and nature of the Seashore, and having a close family member that was forced to vacate in order to allow creation of a tule elk reserve), and know (by way of various community meetings and personal conversations) that other similar situated permittees within the agricultural community of the Seashore share my concerns about the uncertainty to the agricultural businesses, way of life, and homes, that this litigation presents.

10. Like many other lessees/permittees, my wife and I and our respective families have been deeply involved in the tapestry of the Point Reyes area for decades.

11. Both my wife and I (and children and grandchildren) love the Point Reyes National Seashore and we have lived nearly our whole lives here, working, observing and scenery and wildlife, recreating, and enjoying the area. This includes, but is not limited to, hiking, photography, and continued observation and enjoyment of the pastoral nature and history of the Seashore.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Dated: _____

_____
Gino Lucchesi

<mark>
<mark>
NPS has limited some of the more common practices we have used to control invasive species. We clean stock ponds so that they will hold more and cleaner water. We cemented our feeding barn to reduce mud and sediment. We rotate rest pastures so that livestock are not constantly on the same area. We are also very sensitive about driving in the pasture during wet season, when the ground is soft and subject to compaction. We have picked up and continue to pick up old wire and falling fences from prior years. There are public trails on the Home Ranch and me and members of my family have directed many a lost hiker, answered their questions about ranching and the area's history, and have even given a few elders a ride back to the parking lot.

9. As described above, I am personally fully invested in the administration of the public lands of the Point Reyes National Seashore (including being part of a family that has contributed to the quality and nature of the Seashore, and having a close family member that was forced to vacate in order to allow creation of a tule elk reserve), and know (by way of various community meetings and personal conversations) that other similar situated permittees within the agricultural community of the Seashore share my concerns about the uncertainty to the agricultural businesses, way of life, and homes, that this litigation presents.

10. Like many other lessees/permittees, my wife and I and our respective families have been deeply involved in the tapestry of the Point Reyes area for decades.

11. Both my wife and I (and children and grandchildren) love the Point Reyes National Seashore and we have lived nearly our whole lives here, working, observing and scenery and wildlife, recreating, and enjoying the area. This includes, but is not limited to, hiking, photography, and continued observation and enjoyment of the pastoral nature and history of the Seashore.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Dated: 4-14-22

_____
Gino Lucchesi

<mark>
-4-

<mark>
DECLARATION OF GINO LUCCHESI                                    4:22-cv-00145-KAW
<mark>
<mark>
<mark>
<mark>
<mark>