Tony Francois, Cal. Bar #184100
BRISCOE IVESTER & BAZEL LLP
235 Montgomery Street, Suite 935
San Francisco, California, 94104
Telephone:   (415) 402-2700
Facsimile:   (415) 398-5630
Email:       tfrancois@briscoelaw.net

Caroline Lobdell, Ore. Bar #021236, *pro hac vice pending*
Aaron Bruner, Ore. Bar #133113, *pro hac vice pending*
WESTERN RESOURCES LEGAL CENTER
9220 SW Barbur Blvd., Suite 119 #327
Portland, Oregon 97219
Telephone:   (503) 768-8500
Facsimile:   (503) 222-3255
Email:       clobdell@wrlegal.org
             abruner@wrlegal.org

Attorneys for Proposed Defendant-Intervenor
POINT REYES SEASHORE RANCHERS ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RESOURCE RENEWAL INSTITUTE; CENTER FOR BIOLOGICAL DIVERSITY; and WESTERN WATERSHEDS PROJECT,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL PARK SERVICE, a federal agency,<br><br>Defendant,<br><br>POINT REYES SEASHORE RANCHERS ASSOCIATION,<br><br>Proposed Defendant-Intervenor. | Case Number: 4:22-cv-00145-KAW<br><br>**DECLARATION OF KEVIN LUNNY** |

I, Kevin Lunny, under threat of penalty of law and pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1. I make this declaration in support of proposed intervenor's Motion to Intervene in the above-referenced case. I am competent to testify about the matters set forth herein and am over 18 years of age.

2. I am a member of the Point Reyes Seashore Ranchers Association ("PRSRA") that seeks intervention in this case and I have personal interests at stake, and knowledge concerning, this litigation. I have personally resided on the Lunny Ranch (also known as the G Ranch), now included within the boundaries of the Point Reyes National Seashore ("Seashore"), for my entire life (with limited exceptions of temporarily living off the Seashore, for example, while attending college). I have been an integral part of my family's ranching business since I was a child, growing up working on the ranch, and embracing and investing in the agricultural way of life on the Point Reyes peninsula. I received a B.S. in Animal Science at the University of California, Davis. I am the past chair of the Marin Farmers Market Association, past chair of the Agricultural Institute of Marin, past board member of the Pacific Coast Shellfish Grower's Association, past board member of Marin Organic, and current board member of the Marin County Farm Bureau.

3. For as long as I have lived, my family's home and ranching business have been on the Point Reyes peninsula, now included within the boundaries of the Seashore. My grandfather started the Lunny ranching business around the 1940s when he started leasing the area on the seashore currently known as the "G Ranch" from the Radio Corporation of America. Initially, my family was primarily engaged in the dairy business until around the 1970s, when my family converted to the beef cattle ranching business. Our family ranch has been consistently engaged in cattle ranching on the Seashore from the 1970s to present. Like many of the other permittees, our family has operated our ranch over multiple generations and decades.

4. The family ranch business is currently primarily operated by my wife, Nancy Lunny, and me. The ranching business is an important source of income, livelihood, economic

and emotional well-being for our family.  Without the ability to graze on the Seashore, my family and I, and our family business, would be economically devastated.

5. When the federal government acquired the lands to establish the Seashore, the National Park Service ("NPS") continued to lease the G Ranch in the same manner as Radio Corporation America.  That is, NPS leased the G Ranch by way of 5-year special use permits ("SUPs").  The special use permits addressed terms of use for grazing, cultivation of forage crops and residing in our homes on the G Ranch.  Our special use permit allowed us to graze 1,080 Animal Unit Months ("AUMs") per year, or an average of 90 cows over a twelve-month period and grow forage crops on up to 180 acres of crop land on the G Ranch.  As NPS initiated the Comprehensive Ranch Management Plan Environmental Assessment to update the ranch management portion of the 1980 General Management Plan, NPS authorized our grazing via annual letters of authorization, which reflected similar terms and conditions for grazing, forage crop cultivation and residing on the Seashore as the previous 5-year SUPs.  These letters were issued on an annual basis and the short duration of the authorization caused my family and me great concern and uncertainty about our family business, way of life, and our home, given we were able to forecast only one year at a time.  The change from 5-year SUPs to annual authorizations made it very difficult for us to make wise and informed capital investment decisions necessary to long-term planning of our home, business, and way of life.  Even when we received 5-year SUPs, we were engaged in conversations with NPS to develop longer-term (more than 5-year) authorizations so that we would be able to adequately plan and stabilize.

6. The current status of the leases is more complicated.  Pursuant to a settlement agreement reached in *Resource Renewal Institute, et al. v. National Park Serv.*, Case No. 4:16-cv-00688-SBA (N.D. Cal.), NPS was required to amend the 1980 GMP and assess strategies for "future management of the lands" currently leased for ranching through preparation of an environmental impact statement and associated Record of Decision by July 14, 2021.  *Id.*, Dkt. No. 143, ¶¶ 1-3.  During this Interim Period, NPS was able to issue so-called "Interim Leases" to ranches already operating within the Seashore through July 14, 2022.  *Id.*, Dkt. No. 143, ¶ 4 & Definition G.  The Lunny Ranch currently operates under such an "Interim Lease."  The interim

lease simply extends the authorities in the previous Lunny Ranch (G Ranch) 5-year special use permit.

7.  Under the current General Management Plan Amendment and Record of Decision ("GMPA/ROD"), NPS is authorized to continue ranching on all the ranches in the Seashore through the issuance of 20-year lease/permits.  ROD at 6.  However, it is unclear at this time how NPS plans to deal with the leases going forward, given this ongoing litigation.  Again, the lack of certainty involved due to this lawsuit makes long-term planning very difficult.  Any further delay in the issuance of the long-term leases will harm our family's ranching heritage on the Point Reyes peninsula.

8.  Long-term investment and long-term maintenance projects simply do not make sense with only short-term grazing leases/permits, despite the fact that many of these investments and maintenance projects would be environmentally beneficial.  For just one example, in cooperation with the Natural Resource Conservation Service ("NRCS"), the Lunny Ranch previously prepared an Environmental Quality Improvement Program project in order to implement a number of resource conservation practices.  The work would include water system improvements that will appropriately distribute cattle and replace many existing electrically powered pumps with solar powered pumps, so that the entire water system at the Lunny Ranch would be "off the grid" and climate friendly, with only the sun and gravity providing energy to move water.  It also includes pasture planting and some fencing, including wetland area exclusions, that would allow for improved distribution of cattle, more diverse native pasture species, and increased soil protection.  Unfortunately, Lunny Ranch cannot justify these improvements with only short-term grazing authorizations from the NPS.  Other similar repairs sorely needed include fencing and upkeep to a historic barn on the property.

9.  In the current Environmental Impact Statement for the current GMPA, the NPS fully analyzed the forage production on the G Ranch.  Hay, silage and haylage is an integral part of the Lunny Ranch farm plan and has been ongoing by the Lunny family since the 1940s.  The Final Environmental Impact Statement ("FEIS") approved the continuation of forage production on the G Ranch.  However, without notice or explanation, in the ROD, the NPS prohibits forage

production on the G Ranch, yet allows forage production on other ranches. This inequitable change creates serious financial hardship on the Lunny Ranch and the Lunny family. Now that we will not be allowed to farm on our farm as we have since before the PRNS was established, our family will be forced to purchase alfalfa hay, and have it trucked in from a distance for supplementary winter feed which will necessitate building a hay barn to store the purchased feed. Haylage as produced by the Lunny Ranch did not require storage in a hay barn. Furthermore, before the ROD was released, in cooperation with the California Air Resources Board's program to reduce emissions, we signed for the purchase of a new $152,000 farm tractor for use in forage cultivation at the G Ranch. With this unanticipated reversal in the ROD, we will be forced to either make payments on a tractor we can't use for this purpose or to sell the tractor, likely at a loss.

      10. The Lunny family has cultivated row crops within a 5-acre fenced garden on the G Ranch since around 2004. The garden has an underground irrigation system and the G Ranch has enough water to continue this use. We have grown organic artichokes for restaurants and farmers markets as well as other perennial and annual row crops. In scoping, we made it clear that this is an important economic activity and that we hope to continue this use. After full analysis, the FEIS approved row crops on ranches within PRNS. However, without notice or explanation, in the ROD, NPS prohibits all row crops, including the row crops that were an ongoing activity at the G Ranch. This creates a series of economic and emotional hardships on the Lunny Family. We could be forced to remove the 6' high deer fence that surrounds the garden and we could be forced to remove the irrigation system. Our daughter Brigid, who studied sustainable agriculture, and who is directly involved in our day-to-day ranching activities, was planning to take over the garden management portion of our farm. Without the garden, there may not be enough income to keep the next generation involved in the family business.

      11. The Lunny Ranch farm plan, as supplied to NPS during scoping, included raising chickens for meat and eggs. We hoped to raise 500 laying hens and 500 meat birds. This very small-scale activity could add income to our farm. After full analysis, the FEIS approved this

nominal level of poultry raising on ranches within PRNS and GGNRA. However, without notice or explanation, in the ROD, NPS prohibits the poultry on ranches. We were excited about adding chickens to our farm activities. It would have added additional farm income as well as jobs for our family members. We have done much planning for this activity and will now need to do more planning to look for a different source of farm income.

12. I have worked directly with the Marin Carbon Project and the Carbon Cycle Institute for many years. I have personally been involved in many trials performed by these groups to scientifically analyze how particular practices can help to sequester atmospheric carbon into grassland soils. Soils on both dairy and beef ranches can benefit from compost application. Compost is an organic soil amendment, not a fertilizer. We have done some soil sampling at the G Ranch and plan to do more. The G Ranch has some pastures with soils low in organic matter and low in carbon. I believe these soils would benefit from a carefully planned restoration, including compost. The soils could be restored to a more natural level of organic matter and carbon that could support native grass species. The result of this approach includes better water holding capacity, less runoff, better water infiltration, higher organic matter, better plant growth, more drought resilience and reduced atmospheric carbon. The Lunny Ranch previously had NPS authorization to produce compost at the G Ranch and to use compost on the G Ranch. Under the new plan, the NPS now prohibits compost use on the G Ranch, yet allows compost and manure application to soils on other seashore ranches. This new inequitable prohibition limits the restoration tools necessary for our soils. We are required by NPS to produce enough forage to feed our cows and leave 1,200 pounds of forage after the grazing season. If we are not allowed to provide the necessary care to the soils on the G Ranch, we will have a more difficult time meeting NPS requirements, competing with other producers, providing an income for our family and sequestering carbon in our soils to mitigate climate change.

13. Our ranching business aims to be ecologically sustainable. In fact, Lunny Ranch was the first ranch located within the Seashore to receive organic certification and was the first ranch in Marin County to produce certified organic beef. The Lunny Ranch has also been

recognized for "excellence in rangeland management" by receiving an award from the California Society of Rangeland Management in 2009.  To my knowledge, we were the first livestock operation in California to earn "Salmon Safe" certification because of our exceptional pasture, rangeland, and wetland stewardship.

14. The Lunny Ranch has previously applied for technical and financial assistance from the Marin Resource Conservation District to create a carbon farm plan that would increase the environmental benefits provided by grazing by implementing carbon beneficial practices.  I have personally witnessed some of the environmental benefits of grazing that our ranching operation offers the Seashore and that ranching throughout the Seashore contributes to the character of the Seashore generally, as well as to the community and the public.  Our grazed California Coastal Prairie grasslands support a wide variety of native bird and animal species that I, other Seashore ranchers, and many Seashore visitors enjoy.  Our family has built new fences, adjusted other fence lines, redirected vehicular access to minimize disturbance to sensitive species, protected wetland areas, and controlled grazing to enhance habitat for endangered species on the Lunny Ranch, including endangered plant species that are benefited by livestock grazing, such as the *Sonoma alopecurus*.  Well-managed grazing also helps ward off incursion of invasive plant species, preventing them from taking over the rangelands.  Our family ranch has provided, and continues to provide, ecological benefits by maintaining the native nature of the grassland, thereby maintaining the pastoral scenery and wildlife habitat – one of the significant attributes that led to the establishment of the Seashore.

15. As I described above, I am personally fully invested in the administration of the public lands of the Seashore (including being a part of a family that has contributed to the quality of the nature of the Seashore), and know (by way of various community meetings and personal conversations) that other similarly situated lessees and permittees within the agricultural community of the Seashore share my concerns about the uncertainty to our agricultural businesses, our way of life, and our homes that this litigation presents.

16. I love the Point Reyes National Seashore and have spent my life living, working, observing wildlife and scenery, recreating, and enjoying this land that has been home to our

family for 5 generations. As a resident of the Seashore, I engage in daily recreational and aesthetic activities here, including but not limited to hiking, photography, and continued observation and enjoyment of the pastoral nature and history of the Seashore.

I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge.

Dated: 4/12/2022

_____
Kevin Lunny

-8-

DECLARATION OF KEVIN LUNNY                                          4:22-cv-00145-KAW